1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    WILLIAM ALBRO,                          No.  1:18-cv-01156-DAD-JLT

12                    Plaintiff,

13         v.                                 ORDER GRANTING DEFENDANT'S
                                              MOTION TO DISMISS PLAINTIFF'S FIRST
14    THOMAS B. MODLY, Acting Secretary        AMENDED COMPLAINT
      of the United States Department of the
15    Navy,                                   (Doc. No. 32)

16                    Defendant.

17

18         This matter came before the court on October 16, 2019 for a hearing on defendant Thomas

19   B. Modly's motion to dismiss plaintiff's first amended complaint.[1]  (Doc. No. 32.)  Attorney John

20   T. Harrington appeared on behalf of plaintiff William Albro.  Assistant United States Attorney

21   Joseph Frueh appeared on behalf of defendant.  The court has considered the parties' briefs and

22   oral arguments, and for the reasons set forth below, will grant defendant's motion to dismiss.

23                                     **BACKGROUND**

24         Plaintiff is an employee of the Naval Air Warfare Center Weapons Division

25   ("NAWCWD") in China Lake, California.  He brings this action under Title VII of the Civil

26   _____

27   [1]  The motion to dismiss plaintiff's original complaint was brought by defendant Richard V.
     Spencer, Secretary of the United States Department of the Navy.  (Doc. No. 20.)  Pursuant to
     Federal Rule of Civil Procedure 25(d), defendant Spencer's successor Thomas B. Modly, Acting
28   Secretary of the United States Navy, is automatically substituted as the defendant in this action.

                                              1

Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., claiming that he experienced disparate treatment at NAWCWD based on his non-affiliation with the Church of Jesus Christ of Latter-day Saints ("LDS Church"), and that he experienced retaliation when he complained of such discrimination.

In his first amended complaint ("FAC") plaintiff alleges as follows.  Plaintiff holds a bachelor's degree in Chemistry, as well as a master's degree and Ph.D. in Physical Chemistry. (Doc. No. 28 at ¶ 8.)  In November 2006, plaintiff began working NAWCWD.  (*Id.* at ¶¶ 9, 14.) He performed his job duties well and advanced to the position of Firing Officer, where he had authority to carry out tests using explosives.  (*Id.* at ¶ 36.)  As part of his duties, he received sponsorships from other agencies to fund and carry out testing for projects and research, and he had custody of and responsibility for approximately $10 million worth of laboratory equipment. (*Id.* at ¶¶ 38, 42.)

Shortly after plaintiff started working at NAWCWD, his co-worker Ephraim Washburn— a widely-known devout member of the LDS Church, who served as the High Priest and displayed the Book of Mormon at work—began pressuring plaintiff and plaintiff's wife to join the local LDS Church.  (*Id.* at ¶¶ 14, 16.)  Beginning in late 2006, Washburn continuously attempted to recruit plaintiff to join the LDS Church while at work, including by inviting plaintiff to church activities, such as the baptism of Washburn's son.  (*Id.* at ¶¶ 21, 22.)  Other members of the LDS Church who worked at NAWCWD assisted Washburn with his efforts by visiting plaintiff's home, offering favors and assistance, soliciting plaintiff at work to join the LDS Church, and offering promises to plaintiff that he would receive better treatment at work if he joined the LDS Church.  (*Id.* at ¶ 15.)  NAWCWD employees who are members of the LDS Church "worship and socialize together, and provide support, benefits, and advantages at work to their fellow LDS Church members."  (*Id.* at ¶ 10.)  Plaintiff asserts that these employees are often able to influence, negatively or positively, the relationship between employees and their agency sponsors, who make funding decisions that affect the work being done by NAWCWD employees.  (*Id.* at ¶ 11.) Plaintiff also asserts that these employees are "able to direct and influence other actions that affect the terms and conditions of employment for [NAWCWD] employees based on their membership, or non-membership, in the LDS Church."  (*Id.* at ¶ 12.)

1        Plaintiff's wife reluctantly joined the LDS church and was baptized by Washburn, who

2  proclaimed that he "got Rick's wife," and LDS Church members often said that a husband would

3  typically join within two years after his wife joined.  (*Id.* at ¶¶ 17–20.)  Plaintiff clearly and

4  repeatedly told Washburn that he did not want to join the LDS Church, but Washburn ignored

5  him, and other LDS Church members continued recruiting efforts even after plaintiff's wife

6  disassociated from the LDS Church in 2010.  (*Id.* at ¶¶ 30–35.)[2]

7        Plaintiff and Washburn had a collegial work relationship as co-workers until plaintiff's

8  wife disassociated from the LDS Church.  (*Id.* at ¶¶ 28, 29.)  Hostility toward plaintiff in the

9  workplace began almost immediately after Washburn became Branch Head in late 2012 and thus

10  assumed a position as plaintiff's direct supervisor, which "was the first time that Washburn was

11  in a position at [NAWCWD] to impact [plaintiff's] position."  (*Id.* at ¶¶ 48, 49.)  Although

12  plaintiff had applied and interviewed for that Branch Head position, he claims that he was not

13  bitter or resentful that Washburn was selected, but was concerned about being under Washburn's

14  supervision given his resistance to Washburn's LDS-recruiting efforts.  (*Id.* at ¶¶ 43–45.)

15        In early 2013, Washburn gave plaintiff's cubicle to another employee and responded to

16  plaintiff's concern that some of his personal property items were missing by commenting

17  "[t]ough[,] [d]eal with it"—which plaintiff alleges was a dismissive response due to plaintiff's

18  refusal to join the LDS Church.  (*Id.* at ¶¶ 50–52.)  Washburn also placed LDS Church member

19  and Brent Headman's son Trevor Headman on plaintiff's team, even though plaintiff was

20  supposed to have autonomy in choosing his team, and Trevor continuously attempted to recruit

21  plaintiff while at work and frequently quoted from the Book of Mormon while working with

22  plaintiff.  (*Id.* at ¶¶ 46, 47.)  In September 2013, Washburn improperly provided secret

23  /////

---

24

25  [2] Plaintiff does not allege specific recruiting efforts by Washburn after his wife's disassociation in 2010.  Rather, he alleges that in 2011, Brent Headman, a Division Head at NAWCWD and

26  LDS Church member, approached plaintiff at work, asked plaintiff to join the LDS Church, and told plaintiff that he could help plaintiff with his work at NAWCWD if he joined.  (*Id.* at ¶¶ 32,

27  33.)  A few months later, Headman came to plaintiff's home to discuss an LDS Church matter with his wife (even though she had disassociated and had repeatedly expressed her wish to be left

28  alone) and again told plaintiff that he should join the LDS Church.  (*Id.* at ¶¶ 34, 35.)

1   information about a patent that plaintiff was working on to an LDS Church member at Purdue

2   University "due to [plaintiff's] refusal to join the LDS Church." (*Id.* at ¶¶ 53, 55.)

3           In June 2014, plaintiff was the most qualified candidate who interviewed for a Division

4   Head position but was not selected because he was purportedly "too valuable to lose," though

5   plaintiff alleges that "[i]n fact, [he] did not receive the position because of the negative influence

6   of Washburn and other LDS Church members at [NAWCWD], who were displeased by

7   [plaintiff's] refusal to join the LDS Church." (*Id.* at ¶¶ 56–58.)  In July 2014, Washburn

8   knowingly allowed plaintiff to use a fume hood that had failed a safety inspection and ignored the

9   dangers to plaintiff and others who may have used the hood, "because of [plaintiff's] refusal to

10  join the LDS Church." (*Id.* at ¶¶ 59–61.)

11          Since becoming Branch Head, Washburn has interfered with plaintiff's relationships with

12  sponsors, making it more difficult to obtain funding, and instructed potential sponsors and

13  NAWCWD employees not to work with plaintiff and to deny plaintiff adequate facilities to

14  continue his research. (*Id.* at ¶¶ 62–63.)  Between November 2014 and January 2015, plaintiff

15  reported the troubles he faced completing work for agency sponsors because of interference from

16  Washburn and Washburn's subordinates to his third-level supervisor, Greg Wheelock, who had

17  expressed interest in plaintiff's projects and research. (*Id.* at ¶¶ 64–65.)

18          In January 2015, plaintiff had a performance review meeting with Washburn, who told

19  him that "it will be political from here on out," and plaintiff found himself defending against false

20  allegations of wrongdoing roughly every other week following that meeting. (*Id.* at ¶¶ 66, 67.)

21  When someone tried multiple times to access plaintiff's explosives safe, causing a lock-out,

22  someone else contacted 911 because of the potential security risk, and Washburn and

23  management accused plaintiff of having caused unnecessary panic by alerting 911 and

24  mismanaging the situation, even though he was not the person who called 911. (*Id.* at ¶ 68, 69.)

25  Plaintiff alleges that Washburn made this false accusation "because of [plaintiff's] refusal to join

26  the LDS Church." (*Id.* at ¶ 70.)  Then, in February 2015, NAWCWD management ordered a

27  mediation between plaintiff and Washburn, and the conclusion of that mediation was a conclusion

28  that there was a "lack of trust" between them. (*Id.* at ¶ 71.)  In March 2015, plaintiff saw the

4

words "TO BE FIRED" next to his name on a board at the office, which was visible to a number of people, and plaintiff alleges this too was done "because of his refusal to join the LDS Church." (*Id.* at ¶ 72.)

Also in March 2015, plaintiff met with Human Resources Specialist Christine Farris and Division Head of the Energetics Division Jeff Davis, plaintiff's second level supervisor, and reported to them that he did not believe having Washburn as his supervisor was appropriate because Washburn had baptized his wife into the LDS Church and had tried to recruit plaintiff to join the LDS Church. (*Id.* at ¶¶ 73, 74.) At that meeting, plaintiff also reported his belief that NAWCWD employees who were LDS Church members were treated more favorably than him. (*Id.* at ¶ 75.) There was no investigation into his complaint that "he was being treated unfairly due to his refusal to join the LDS Church." (*Id.* at ¶ 76.) Later that month, plaintiff learned that a co-worker had falsely charged hours of work to his funding account and had been incentivized by Washburn to sabotage plaintiff's funds in exchange for a promotion. (*Id.* at ¶¶ 77, 78.)

In April 2015, a physicist who worked in an office that plaintiff had vacated two years earlier discovered a gun on a top shelf, and though it was a tranquilizer gun of unknown origin, Washburn falsely accused plaintiff of having an unauthorized gun because of his refusal to join the LDS Church. (*Id.* at ¶¶ 79, 81–82.) Later that month, plaintiff learned that he had not been receiving emails about upcoming inspections because Washburn directed plaintiff's name be removed from the email list or that his email address be altered to prevent delivery "due to his refusal to join the LDS Church." (*Id.* at ¶¶ 85–87.) Then in May 2015, Washburn directed the same co-worker who sabotaged plaintiff's accounts to try to gain access to plaintiff's explosives safes "because of [plaintiff's] refusal to join the LDS Church." (*Id.* at ¶¶ 83, 84.)

In June 2015, plaintiff had a second meeting with HR Specialist Christine Farris and Division Head Jeff Davis, which was also attended by Darlene Soto.[3] (*Id.* at ¶ 88.) At that second meeting, Davis said he had conducted a managerial investigation and concluded that

---

[3] Plaintiff does not explain in the allegations of his complaint who Darlene Soto is, what her role was at NAWCWD, or why she attended the meeting. Plaintiff alleges only that she took detailed notes during the meeting and that her records were taken by NAWCWD upon her retirement. (*Id.* at ¶¶ 88, 92.)

1   plaintiff was "the problem," and he refused to accept the documents that plaintiff brought with

2   him to corroborate his claims that Washburn and others targeted him "due to his refusal to join

3   the LDS Church." (*Id.* at ¶¶ 89–91.) Davis and Farris also told plaintiff that he would not be

4   permitted to bring representatives to any future meetings. (*Id.* at ¶ 93.) Davis informed

5   Wheelock that plaintiff had been offered disciplinary measures and refused them; however,

6   plaintiff was never offered any such measures. (*Id.* at ¶¶ 94, 95.) Later that month, plaintiff

7   learned that, at Washburn's direction, management planned to reassign plaintiff to work under

8   Martin Minthorn, which would require plaintiff to leave his lab and equipment behind, "because

9   of [plaintiff's] refusal to join the LDS Church." (*Id.* at ¶¶ 96–98.) Washburn and Davis

10  confronted plaintiff and ordered him to cut the locks of the secure area in his lab and threatened to

11  escort plaintiff to base counseling when he expressed concern about that plan. (*Id.* at ¶¶ 99–102.)

12  Again, according to plaintiff, Washburn directed these actions "because of [plaintiff's] refusal to

13  join the LDS Church." (*Id.* at ¶ 103.)

14          In July 2015, plaintiff learned from Davis that there had been a recommendation to

15  remove plaintiff's security clearance. (*Id.* at ¶ 104.) Around the same time, Washburn directed

16  NAWCWD management to require plaintiff to undergo a psychological exam by the base

17  psychologist, who found no psychological issues with plaintiff. (*Id.* at ¶¶ 105, 106.) Later that

18  month, the NAWCWD security team told plaintiff the investigation into his security clearance

19  had been adjudicated in his favor. (*Id.* at ¶ 107.) Shortly thereafter, "HR and management, as a

20  result of Washburn's influence and direction, ordered an inquiry of [plaintiff] by [Division Head]

21  Robert Long." (*Id.* at ¶ 108.) Long was argumentative in interviews with plaintiff and refused to

22  accept documents plaintiff offered in his defense. (*Id.* at ¶ 109.) On or about October 8, 2015,

23  Long issued the report of his investigation, which found a number of instances of purported

24  wrongdoing by plaintiff. (*Id.* at ¶ 112.) Plaintiff denied the allegations contained in the report,

25  which he contends were not true or were grossly distorted, though he had difficulty responding

26  fully because the report he received was heavily redacted. (*Id.* at ¶¶ 113, 114.)

27          On or about December 9, 2015, plaintiff met with Farris and Wheelock, who informed

28  him that Wheelock had proposed suspending plaintiff for seven days and told him to "resign or

face the consequences." (*Id.* at ¶ 115.)  The Notice of Proposed Suspension (the "Notice") was based primarily on allegations mirroring those in Long's report.  (*Id.* at ¶ 116.)  To respond to the Notice, plaintiff requested an unredacted copy of the report from Charles Bechtel, who refused plaintiff's request.[4]  (*Id.* at ¶¶ 117, 118.)  Plaintiff also requested the identities of the witnesses relied upon for Long's report, but management did not provide this information or copies of the written notes underlying the report.  (*Id.* at ¶ 119.)  On January 11, 2016, plaintiff submitted a 234-page response to the Notice denying the allegations.  (*Id.* at ¶ 120.)  Despite this lengthy and detailed response, Bechtel upheld the Notice on February 16, 2016, and told plaintiff that if plaintiff did not do what Washburn wanted, he would be fired.  (*Id.* at ¶¶ 121, 122.)  Plaintiff alleges that Long's report, the Notice, and the suspension all "resulted from the influence and interference of Washburn and other LDS Church members at [NAWCWD] who were displeased by [plaintiff's] refusal to join the LDS Church.  (*Id.* at ¶ 123.)

On February 23, 2016, Wheelock assigned plaintiff to work under Minthorn.  (*Id.* at ¶ 124.)  Under this arrangement, plaintiff's lab and equipment were turned over to Washburn, and plaintiff "was also subjected to undefined 'constraints' and threatened with additional discipline if he violated any of [them]." (*Id.*)  Plaintiff was barred from owning future equipment and was subjected to petty administrative harassment.  (*Id.* at ¶¶ 125, 126.)  "Wheelock took this action because of the influence and interference of Washburn and other LDC Church members at [NAWCWD] and the suspension that resulted from their influence and interference." (*Id.* at ¶ 127.)  Plaintiff reached out to management for assistance in locating a facility to perform testing but was unable to secure facilities, as a result of which he lost some of his funding and was pressured to turn over funding he had received to Washburn.  (*Id.* at ¶¶ 125, 126.)

After receiving the Notice on or about December 9, 2015, plaintiff contacted the Equal Employment Opportunity ("EEO") Office and made an informal complaint, and he amended his EEO informal complaint on or about February 16, 2016 to include the upholding of his

---

[4]  Plaintiff does not explain who Charles Bechtel is in the allegations of his FAC.  However, the Notice states that Charles Bechtel is the Technical Director for the Weapons and Energetics Department and that he "will make the final decision on the proposed suspension action . . .." (*See* Doc. No. 20-5 at 9–10.)

suspension.[5]  (*Id.* at ¶¶ 128, 129.)  Plaintiff filed a formal EEO complaint on or about April 18, 2016.  (*Id.* at ¶ 130.)

On August 24, 2018, plaintiff initiated this civil action against the Secretary of the United States Department of the Navy asserting three claims under Title VII:  (1) discrimination based on his non-affiliation with the LDS Church; (2) a hostile work environment based on his non-affiliation with the LDS Church; and (3) retaliation for engaging in EEO activity.  (Doc. No. 1.)  On March 29, 2019, defendant filed a motion to dismiss, which the court granted in part.  (Doc. Nos. 20, 27.)[6]

Plaintiff filed his FAC on July 17, 2019, alleging a Title VII claim for discrimination based on his non-affiliation with the LDS Church and a Title VII claim for retaliation based on his engaging in the protected activity of complaining about that discrimination.  (Doc. No. 28.)  Defendant filed the pending motion to dismiss on August 7, 2019.  (Doc. No. 32.)  Plaintiff filed his opposition on September 3, 2019, and defendant filed its reply on October 1, 2019.  (Doc. No. 36.)

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the legal sufficiency of the complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  A dismissal may be warranted where there is "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to

---

[5]  Plaintiff alleges that he contacted the EEO Office on December 9, 2015 (Doc. No. 28 at ¶ 156), but his formal EEO complaint form reflects that his initial contact with an EEO counselor was on January 19, 2016.  (Doc. No. 20-7 at 3.)

[6]  The court's order dismissed plaintiff's hostile work environment claim with prejudice as untimely and dismissed his retaliation claim with leave to amend.  (Doc. No. 27 at 18–19.)  The court also dismissed plaintiff's disparate treatment claim with prejudice to the extent it was based on unexhausted or untimely incidents.  (*Id.* at 9, 18.)  Plaintiff's disparate treatment claim was otherwise dismissed with leave to amend.  (*Id.*)

1    draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

2    *Iqbal*, 556 U.S. 662, 678 (2009).

3          In determining whether a complaint states a claim on which relief may be granted, the

4    court accepts as true the allegations in the complaint and construes the allegations in the light

5    most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Love v.*

6    *United States*, 915 F.2d 1242, 1245 (9th Cir. 1989). However, the court need not assume the truth

7    of legal conclusions cast in the form of factual allegations. *U.S. ex rel. Chunie v. Ringrose*, 788

8    F.2d 638, 643 n.2 (9th Cir. 1986). While Rule 8(a) does not require detailed factual allegations,

9    "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*,

10   556 U.S. at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a

11   formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also*

12   *Iqbal*, 556 U.S. at 676 ("Threadbare recitals of the elements of a cause of action, supported by

13   mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the

14   plaintiff "can prove facts which it has not alleged or that the defendants have violated the . . . laws

15   in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State*

16   *Council of Carpenters*, 459 U.S. 519, 526 (1983).

17         In ruling on such a motion, the court may consider material that is properly submitted as

18   part of the complaint, documents that are not physically attached to the complaint if their

19   authenticity is not contested and the plaintiff's complaint necessarily relies on them, and matters

20   of public record. *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

21                                        **ANALYSIS**

22         Defendant moves to dismiss plaintiff's FAC in its entirety, arguing that plaintiff has not

23   stated plausible claims for disparate treatment based on his non-affiliation with the LDS Church

24   or for retaliation for complaining about such treatment. (Doc. No 32-1.) Below, the court

25   addresses both of those claims.

26   **A.    Disparate Treatment Claim**

27         Defendant contends that plaintiff's disparate treatment claim must fail because there are

28   no specific facts alleged in the FAC giving rise to a plausible inference that any of the adverse

9

1   employment actions that plaintiff suffered—proposed suspension, adoption of the suspension, and

2   reassignment—were based on plaintiff's non-affiliation with the LDS Church.  (Doc. No. 32 at

3   2.)

4           Title VII makes it unlawful for an employer to discriminate against an employee because

5   of race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).  In this context,

6   religion includes "all aspects of religious observance and practice, as well as belief," including an

7   employee's non-religious affiliation.  *Id.* § 2000e(j); *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168–

8   69 (9th Cir. 2007) (recognizing that Title VII discrimination claim may be based on an

9   employee's lack of adherence to religious beliefs promoted by the employer).  A plaintiff alleging

10  discrimination under Title VII may proceed under two theories:  disparate treatment or disparate

11  impact.  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986–87 (1988).  Here, plaintiff

12  asserts his discrimination claim based on a theory of disparate treatment.  (Doc. No. 34 at 7.)

13          A plaintiff in a disparate treatment case bears the burden of alleging and proving that the

14  defendant employer intentionally discriminated against him.  *Tex. Dep't of Cmty. Affairs v.*

15  *Burdine*, 450 U.S. 248, 253 (1981); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S.

16  324, 335 n.15 (1977) (noting "[p]roof of discriminatory motive is critical" in disparate treatment

17  claims); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (a plaintiff "must

18  show the employer's intent to discriminate, but intent may be inferred from circumstantial

19  evidence").  A plaintiff may prove intent through either "direct or circumstantial evidence

20  demonstrating that a discriminatory reason more likely than not motivated the employer."

21  *Metoyer v. Chassman*, 504 F.3d 919, 930 (9th Cir. 2007).

22          To demonstrate discriminatory intent, a plaintiff may rely on the familiar burden shifting

23  framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Reynaga v.*

24  *Roseburg Forest Prods.*, 847 F.3d 678, 691 (9th Cir. 2017).  Under the *McDonnell Douglas*

25  framework, a plaintiff can establish an inference of discrimination by satisfying the prima facie

26  elements:  "(1) the plaintiff belongs to a protected class, (2) he was performing according to his

27  employer's legitimate expectations, (3) he suffered an adverse employment action, and

28  (4) similarly situated employees were treated more favorably, or other circumstances surrounding

1  the adverse employment action give rise to an inference of discrimination." *Reynaga*, 847 F.3d at

2  691.  Once plaintiff establishes a prima facie case of discrimination, the burden shifts to the

3  defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.

4  *See McDonnell Douglas*, 411 U.S. at 802–03; *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201,

5  1207 (9th Cir. 2008).  If the defendant meets its burden in this regard, the burden shifts back to

6  plaintiff to establish that defendant's proffered reason was a pretext for discrimination.  *St.*

7  *Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993); *Diaz*, 521 F.3d at 1207.[7]

8           Here, the parties focus their arguments on the fourth element of plaintiff's prima facie

9  case, and in particular, whether he has sufficiently alleged that "other circumstances surrounding

10  the adverse employment action give rise to an inference of discrimination."  (Doc. Nos. 32-1 at 9–

11  10; 34 at 8 (plaintiff stating that defendant "does not challenge that [he] is a member of a

12  protected class, that he was qualified for his position[,] or that he experienced an adverse

13  employment action," and "[b]ecause they are uncontested, [he] does not address those elements

14  here"); 36 at 5.)  Thus, the court will address whether plaintiff's allegations of "other

15  circumstances surrounding" the specific adverse employment actions he suffered—the December

16  9, 2015 notice of proposed suspension, the February 16, 2016 decision to uphold the suspension,

17  and the February 23, 2016 reassignment—give rise to an inference of discrimination.

18           Plaintiff contends that his FAC cures the deficiencies this court identified in its previous

19  order addressing defendant's motion to dismiss plaintiff's original complaint, including that

20  plaintiff's citation to *Magden v. Easterday Farms,* No. 2:16-cv-00068-JLQ, 2017 WL 1731705

21  (E.D. Wash. May 3, 2017), was unavailing because his original complaint did not contain

22  allegations comparable to those in *Magden*.  (Doc. Nos. 34 at 8–9; 27 at 11.)  In *Magden*, a

23  plaintiff avoided summary judgment on his claim for discrimination based on his non-Mormon

---

[7]  Although at the pleading stage a plaintiff need not satisfy all elements of his prima facie case to survive a motion to dismiss, rather he must plead only sufficient nonconclusory allegations that give rise to a plausible claim for relief.  *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510–511 (2002) (stating "[t]his Court has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss."); *see also Austin v. University of Oregon*, 925 F.3d 1133, 1137 (9th Cir. 2019) (affirming the Court's reasoning in *Swierkiewicz* after *Iqbal*).

1  affiliation where he alleged and submitted evidence to prove that:  his supervisor gave him a

2  Mormon bible while they were at work and asked him approximately every two weeks whether

3  he had read selected verses; he complained about his supervisor's proselytizing but his complaint

4  was ignored and no investigation was conducted; his supervisor confronted him about his

5  complaint, and he told his supervisor that he "only wanted to talk about work, and not personal

6  matters"; and his supervisor accused him of being "defiant" and terminated plaintiff later that

7  same day purportedly "due to poor communication."  *Id.*

8       Plaintiff contends that his FAC includes allegations that closely align with the facts

9  presented in *Magden*.  Specifically, plaintiff points to his new allegations that Washburn, a

10  widely-known, devout member of the LDS Church:  (i) displayed a Book of Mormon at work; (ii)

11  proclaimed that he "got [plaintiff's] wife" after her baptism in 2006; (iii) pressured plaintiff to

12  join the LDS Church by inviting plaintiff to church activities, like his son's baptism; (iv)

13  continued recruitment efforts despite plaintiff repeatedly telling him that he did not want to join

14  the LDS Church; and (v) placed an LDS Church member on plaintiff's team who continuously

15  attempted to recruit plaintiff while at work and frequently quoted the Book or Mormon while

16  working with plaintiff.  (*See* Doc. No. 34 at 8–9.)  In addition, plaintiff contends that like the

17  plaintiff in *Magden*, he complained about the discrimination he was experiencing when he met

18  with Christine Farris and Jeff Davis in March 2015 and reported that he believed NAWCWD

19  employees who were members of the LDS Church were treated more favorably than him, and that

20  it was inappropriate for plaintiff to be supervised by Washburn, who baptized his wife into the

21  LDS Church and tried to recruit him to join that church.  (*Id*. at 9.)  Plaintiff further alleges in his

22  FAC that his complaint was ignored, and no investigation conducted, also like the plaintiff in

23  *Magden*.  (*Id*. at 9.)

24       However, as defendant points out in his reply, plaintiff alleges that Davis told plaintiff at

25  their second meeting in June 2015 that Davis had conducted a managerial investigation and had

26  concluded that plaintiff was "the problem."  (Doc. No. 36 at 6.)  Thus, plaintiff's allegations are

27  themselves inconsistent and support neither a conclusion that no investigation occurred nor an

28  inference of discrimination, particularly where plaintiff does not allege that Farris and Davis are

12

1   members of the LDS Church.  Unlike the proselytizing supervisor in *Magden*, who confronted

2   that plaintiff about his discrimination complaints and terminated his employment later that day,

3   Washburn was not involved in the three adverse employment actions that plaintiff suffered in late

4   2015 and early 2016, and Washburn's direct recruitment efforts of plaintiff allegedly began

5   nearly a decade before those actions were taken and appeared to have stopped in 2010 when

6   plaintiff's wife disassociated from the LDS Church, if not sooner.[8]

7          In addition, plaintiff cannot avoid dismissal of his discrimination claim merely by

8   appending the phrase "due to [plaintiff's] refusal to join the LDS Church" or "because of

9   [plaintiff's] refusal to join the LDS Church" at the end of each of his allegations about incidents

10  that occurred after Washburn became his supervisor in late 2012—incidents that were alleged in

11  his original complaint and that the court found insufficient to support an inference of

12  discrimination.  (*See* Doc. No. 28 at ¶ 52 (cubicle reassignment), ¶ 55 (secret patent information),

13  ¶ 58 (not selected for promotion), ¶ 61 (ignoring fume hood risks), ¶ 70 (mismanagement of lock-

14  out), ¶ 72 ("to be fired" on whiteboard), ¶ 81 (tranquilizer gun incident), ¶ 84 (explosives safe

15  access), ¶ 87 (inspection emails), ¶ 98 (reassignment under Minthorn), ¶ 103 (cutting locks to lab

16  area).)  Plaintiff characterizes these allegations as Washburn "[taking] a series of discriminatory

17  actions against him, culminating in his suspension . . ." and argues that these allegations "provide

18  the required 'some additional evidence to support the inference that the employment actions were

19  taken because of a discriminatory motive based upon the employee's failure to hold or follow his

20  or her employer's religious beliefs.'"  (Doc. No. 34 at 9–10 (no citation provided though the

21  internal quotation appears to be from *Magden*).)  The court is not persuaded by plaintiff's

22  conclusory argument in this regard.

23          First, merely adding "due to [plaintiff's] refusal to join the LDS Church" to his allegations

24  regarding those incidents does not provide the kind of "factual enhancement" that *Iqbal* requires.

---

[8]  Although plaintiff alleges two incidents of other LDS Church members attempting to recruit him while at work in 2011 and early 2013, plaintiff does not allege that they did so at Washburn's direction.  Even if Washburn had directed their recruitment efforts, plaintiff does not allege that those two individuals were involved in the three adverse employment actions that he suffered at the end of 2015 and early 2016.

13

1    *See Iqbal*, 556 U.S. at 678 (a complaint does not suffice it if tenders naked assertions devoid of

2    further factual enhancement) (internal quotation marks omitted).  Second, even if the court

3    accepts as true plaintiff's bare assertion that those alleged incidents occurred *because he refused*

4    *to join the LDS Church*, those incidents are not the adverse employment actions on which

5    plaintiff's discrimination claim is based.  (*See* Doc. No. 34 at 3 (stating "[t]he discriminatory

6    actions alleged by [plaintiff] prior to the issuance of the Notice of Proposed Suspension to him on

7    December 9, 2015 are properly alleged as background evidence of the Navy's discriminatory

8    animus, not as separately actionable claims.").)  Third, plaintiff merely states in conclusory

9    fashion that these incidents "culminated" in his suspension, without alleging how these incidents

10   are supposedly related to Wheelock's decision to propose a suspension or to Bechtel's decision to

11   uphold plaintiff's suspension.  At best, plaintiff's only allegations that could be construed as

12   connecting the adverse employment actions alleged to his refusal to join the LDS Church are that:

13   (i) the Notice of Proposed Suspension was primarily based on Long's report, and Long's inquiry

14   into plaintiff had been ordered by human resources and management "as a result of Washburn's

15   influence and direction" (Doc. No. 28 at ¶ 108); (ii) Bechtel upheld the suspension and "told

16   [plaintiff] that if [plaintiff] did not do what Washburn wanted, [plaintiff] would be fired" (*id*. at ¶

17   122); and (iii) Wheelock reassigned plaintiff "because of the influence and interference of

18   Washburn and other LDS Church members at [NAWCWD]" (id. at ¶ 127).  Defendant

19   persuasively contends that plaintiff has not adequately alleged "facts supporting the conclusory

20   allegation that the 'influence' and 'interference' of Washburn or unspecified 'LDS Church

21   Members' brought about the discrete employment decisions at issue in this case—i.e.,

22   Wheelock's proposed suspension, Bechtel's adoption of the suspension, and Plaintiff's ensuing

23   reassignment."  (Doc. No. 36 at 6.)  Plaintiff's allegations in this regard are similarly conclusory

24   and lack supporting allegations providing the sort of factual enhancement that could give rise to

25   an inference of discrimination.  As noted, plaintiff has also not alleged that Wheelock or Bechtel

26   are members of the LDS Church nor has he alleged any other facts from which it could be

27   inferred that they had a motive to discriminate against plaintiff based on his non-affiliation with

28   /////

1    the LDS Church.  Merely asserting in conclusory fashion that Washburn influenced their actions

2    is not sufficient.

3         Accordingly, the court finds that plaintiff has not sufficiently alleged facts that give rise to

4    an inference of discrimination and will dismiss plaintiff's disparate treatment cause of action for

5    failure to state a claim.  Plaintiff has already had an opportunity to amend his complaint and to do

6    so with the guidance of the court's prior dismissal order, which discussed deficiencies in his

7    original complaint.  Moreover, plaintiff did not request leave to amend his FAC or proffer any

8    additional facts that he could allege in a second amended complaint if the court were to find that

9    his FAC failed to state a cognizable claim.  Rather, plaintiff maintained in his opposition brief

10   and at the hearing on the pending motion to dismiss that he had sufficiently alleged his claims.

11   Under these circumstances, the court concludes that the granting of further leave to amend would

12   be futile and will therefore dismiss plaintiff's disparate treatment claim with prejudice.  *See*

13   *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 520 (9th Cir. 2013) ("Although

14   a district court 'should freely give leave [to amend] when justice so requires,' Fed. R. Civ. P.

15   15(a)(2), the court's discretion to deny such leave is 'particularly broad' where the plaintiff has

16   previously amended its complaint.") (quoting *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 622

17   (9th Cir. 2004)); *see also Cooper v. Cate*, No. 1:10-cv-899-AWI-DLB, 2012 WL 1669353, at *13

18   (E.D. Cal. May 11, 2012) (dismissing Title VII retaliation and disparate treatment claims without

19   leave to amend, noting that the plaintiff's additional allegations in her third amended complaint

20   did not address the problems discussed in the court's prior order dismissing those claims with

21   leave to amend, which indicated that she was unwilling or unable to cure the repeated

22   deficiencies, and the fact that she had not requested leave to amend again indicated that her "TAC

23   represents the best allegations that can be made consistent with Federal Rule of Civil Procedure

24   11").

25   **B.    Retaliation Claim**

26        Defendant also moves to dismiss plaintiff's second cause of action for retaliation.  Title

27   VII prohibits retaliation by an employer "against an employee for making a charge or otherwise

28   /////

15

1    participating in a Title VII proceeding." *Nilsson v. City of Mesa*, 503 F.3d 947, 953 (9th Cir.

2    2007).  Under § 704 of the Civil Rights Act of 1964, it is unlawful:

3            for an employer to discriminate against any of his employees . . .
             because he has opposed any practice made an unlawful employment
4            practice by [Title VII], or because he has made a charge, testified,
             assisted, or participated in any manner in an investigation,
5            proceeding, or hearing under [Title VII].

6    42 U.S.C. § 2000e-3 (2000).  To make out a prima facie case of retaliation under Title VII, a

7    plaintiff must allege facts demonstrating that "(1) [he] engaged in a protected activity, (2) [he]

8    suffered an adverse employment action, and (3) there was a causal link between [his] activity and

9    the employment decision."  *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065–66 (9th Cir.

10   2003) (quoting *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1196–97 (9th Cir.

11   2003)); *see also Poland v. Chertoff*, 494 F.3d 1174, 1179–80 (9th Cir. 2007).

12          1.      Whether Plaintiff Alleged that He Engaged in Protected Activity

13          A plaintiff can satisfy the first element of a Title VII retaliation claim, participation in a

14   protected activity, by alleging that he filed a formal or informal complaint regarding unlawful

15   employment practices.  *See Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d

16   493, 506 (9th Cir. 2000).  The disputed employment practices need not have been actually

17   unlawful; plaintiff need only show that his belief that an unlawful employment practice occurred

18   was "reasonable."  *Id.*

19          Here, plaintiff alleges that he engaged in protected activity under Title VII when he

20   complained to Farris and Davis in March and June 2015 that he believed NAWCWD employees

21   who were members of the LDS Church were treated more favorably than him, and that it was

22   inappropriate for him to be supervised by Washburn, who baptized his wife and tried to recruit

23   him to join the LDS Church.  (Doc. No. 28 at ¶ 155.)  Plaintiff also alleges that he engaged in

24   protected activity "when he contacted the EEO Office on December 9, 2015, amended his

25   informal complaint in February 2016, filed a formal EEO complaint in April 2016, and requested

26   an EEOC Hearing in November 2016."  (*Id.* at ¶ 156.)  Defendant does not dispute that these are

27   allegations of engagement in protected activity.

28   /////

16

1    The court therefore finds that plaintiff has sufficiently alleged the first element of his Title

2    VII retaliation claim—that he engaged in protected activity.[9]  *See Raad*, 323 F.3d at 1197

3    ("Protected activity includes the filing of a charge or a complaint, or providing testimony

4    regarding an employer's alleged unlawful practices, as well as engaging in other activity intended

5    to oppose an employer's discriminatory practices.") (internal quotations and brackets removed);

6    *see also Finley v. United Parcel Serv. Inc.*, No. 2:16-cv-00055-ROS, 2018 WL 6422082, at *12

7    (D. Ariz. Mar. 30, 2018) (noting that protected activity "must plausibly bear some relation to

8    discrimination on the basis of a protected characteristic" and that "general complaints about the

9    workplace or unfairness are not sufficient").

10         2.    Whether Plaintiff Alleged that He Suffered Adverse Employment Actions

11    As to the second element of a retaliation claim, a challenged action must be "materially

12    adverse," meaning that it would dissuade a reasonable worker from exercising protected rights.

13    *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Ellins v. City of Sierra*

14    *Madre*, 710 F.3d 1049, 1062 (9th Cir. 2013); *Ray v. Henderson*, 217 F.3d 1234, 1242–43 (9th

15    Cir. 2000) (describing an adverse employment action as "any adverse treatment that is based on a

16    retaliatory motive and is reasonably likely to deter the charging party or others from engaging in

17    protected activity").

18    Plaintiff alleges that he suffered the following adverse employment actions:  (i)

19    "[defendant] imposed the proposed suspension against [plaintiff] in February 2016"; (ii) "on

20    February 23, 2016, [defendant] removed [plaintiff] from his laboratory and forced him to turn

21    over custody of his equipment to Washburn"; (iii) "on February 23, 2016, [defendant] began

22    requiring [plaintiff] to report to Martin Minthorn and demoted [plaintiff]" and "subjected [him] to

23    undefined 'constraints' and threatened [him] with discipline if he violated any of the undefined

24    'constraints'"; and (iv) "from 2016 through 2017, [defendant] refused to provide [plaintiff] with

25

26    [9]  In plaintiff's original complaint, he had described his protected activity in March and June 2015
      as meeting with Farris and Davis to complain that "he worked in an unsupportive work

27    environment."  (Doc. No. 27 at 16.)  In ruling on the motion to dismiss plaintiff's original
      complaint, the court determined that complaining about an unsupportive work environment did

28    not constitute protected activity under Title VII.  (*Id.*)

1    adequate facilities to conduct his research and projects, which resulted in some of the funding

2    being lost." (Doc. No. 28 at ¶¶ 157–161; *see also* Doc. No. 34 at 12–13 (arguing that "all of these

3    actions are likely to dissuade an employee from complaining about discrimination" and thus,

4    constitute protected activity under Title VII).)[10]  Defendant does not contend that these alleged

5    actions do not constitute adverse employment actions; rather, defendant argues that plaintiff has

6    failed to allege a causal link between those actions and his engagement in protected activity.

7    (Doc. No. 32-1 at 12–14.)  In response to defendant's causation arguments, plaintiff wholly

8    ignores *those* adverse actions he has relied upon and instead contends—for the first time—that

9    "he has sufficiently pled a causal link between his protected activity" in March and June 2015 and

10   the following *other* actions:

11              On or about June 16, 2015 (six days after [plaintiff] complained to
              management), [he] learned that the Navy planned to transfer him. On
12              or about July 7, 2015 (twenty-seven days after [he] complained to
              management), [he] learned that a recommendation was made to
13              remove his security clearance.  And on or about July 27, 2015 (forty-
              seven days after [he] complained to management), the Navy ordered
14              an inquiry into [him].

15   (Doc. No. 34 at 15 (internal citations omitted).)  But, these actions taken in June and July 2015

16   were not alleged in plaintiff's FAC as forming the basis for his retaliation claim and were not

17   mentioned in the "adverse actions" section of his brief in opposition to the pending motion.

18   Moreover, plaintiff explicitly stated in his FAC that "he cites the earlier actions against him as

19   evidence of the discriminatory motivation of the actions that occurred on or after December

20   2015." (Doc. No. 28 at ¶ 148.)  In addition, this court has already determined that plaintiff's Title

21   VII claims cannot be predicated on unexhausted and untimely incidents; that is, adverse

22   employment actions that occurred on or before December 9, 2015, because plaintiff initially

23   sought EEO counseling on January 19, 2016.  (Doc. No. 27 at 7–8) (citing 29 C.F.R. §

24   1614.105(a)(1)); *see also Nguyen v. Dep't of Navy*, 412 F. App'x 926, 928 (9th Cir. 2011) ("[T]o

25   support her discrimination and retaliation claims[,] Nguyen cannot rely on incidents prior to . . .

26

27   _____
     [10]  Unlike his discrimination claim, plaintiff does not allege that the Notice of Proposed
     Suspension dated December 9, 2015 was an adverse employment action with respect to his
28   retaliation claim.

                                                    18

1  forty-five days before she initiated contact with an EEO counselor.").[11]  Accordingly, the

2  incidents that occurred in June and July 2015 cannot support plaintiff's Title VII retaliation claim.

3      The court therefore finds that plaintiff has sufficiently alleged that he suffered adverse

4  employment actions beginning with his suspension in early February 2016 and no earlier.

5          3.      Whether Plaintiff Alleged a Causal Link

6      Plaintiff alleges that each of the adverse employment actions beginning with his

7  suspension in February 2016 was taken "in part because [he] had previously complained that he

8  was being treated unfairly because of his refusal to join the LDS Church."  (Doc. No. 28 at ¶¶

9  157, 158, 160, 161.)  Defendant argues that plaintiff has not sufficiently alleged a causal link

10  because:  (1) he failed to allege the requisite but-for causation in that he asserts that the adverse

11  actions were taken *in part* because of his protected activity; (2) he did not allege that Bechtel or

12  Wheelock were aware of his complaints to Farris and Davis; (3) the eight- to eleven-month gap

13  between his complaints to Farris and Davis and the adverse actions precludes an inference of

14  causation based on temporal proximity; and (4) an inference of causation based on temporal

15  proximity does not arise because his allegations suggest an "obvious alternative explanation."

16  (Doc. No. 32-1 at 11–14.)

17          a.      But-For Causation

18      The Supreme Court has clarified that "Title VII retaliation claims require proof that the

19  desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Texas*

20  *Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013).  "Title VII retaliation claims must be proved

21  according to traditional principles of but-for causation, not the lessened [motivating factor]

22  causation test stated in [42 U.S.C.] § 2000e–2(m)."  *Id*. at 360.  But-for causation "requires proof

23  that the unlawful retaliation would not have occurred in the absence of the alleged protected

24  activity of the employee, activity which includes opposition to employment discrimination, and

25  submitting or supporting a complaint about employment discrimination."  *Goins v. Cty. of*

26  *Merced*, No. 1:13-cv-01245-AWI-SK, 2014 WL 3362254, at *5 (E.D. Cal. July 9, 2014)

27  _____

28  [11]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1   (concluding that even though plaintiffs' complaint did "not actually use the phrase 'but-for,' they

2   adequately pled but-for causation by alleging their supervisor's retaliatory conduct started after he

3   learned that plaintiffs had filed administrative complaints against him for harassment").

4       Defendant argues that by alleging the adverse actions were taken "in part" because of his

5   protected activity, plaintiff has failed to allege but-for causation.  (Doc. No. 32-1 at 12.)  Plaintiff

6   contends that defendant misstates "but-for" causation as a "sole" or "exclusive" cause standard,

7   and that one bringing such a claim is not required to allege that "his complaint to HR of his

8   discriminatory treatment were the sole cause of the adverse actions he suffered."  (Doc. No. 34 at

9   13, 14.)

10      While plaintiff was not required to use the phrase "but-for" as magic words, by using the

11  phrase "in part," plaintiff essentially alleges that his protected activity played *a* role, played *a*

12  part, and was *a* cause—he has not alleged that his protected activity was the *but-for* cause.  *See*

13  *Diorio v. Cty. of Kern*, No. 1:11-cv-01569-LJO, 2013 WL 1127687, at *9 (E.D. Cal. Mar. 18,

14  2013) (finding the plaintiff failed to show a causal link with respect to her Title VII retaliation

15  claim where her statement that she was terminated "in part due to her insubordination issues with

16  each of her three supervisors actually detracts from her effort to show that her [] complaint [about

17  a hostile work environment] was a but-for cause of her termination"); *see also Arnold v. Research

18  Found. for State Univ. of N.Y.*, 216 F. Supp. 3d 275, 288–89 (E.D.N.Y. 2016) (finding the

19  plaintiff failed "to allege that her age was a but for cause of her termination" because she "admits

20  that her termination was motivated 'at least in part' by her age," which is "insufficient because

21  [she] must allege that age was more than a mere motivating factor; [she] must show that her age

22  was a but for cause"); *Mazur v. N.Y. City Dep't of Educ.*, 53 F. Supp. 3d 618, 638 (S.D.N.Y.

23  2014), *aff'd*, 621 F. App'x 88 (2d Cir. 2015) (applying Supreme Court's decision in *Nassar* and

24  concluding that "it is not enough for a defendant's adverse employment action to be based in part

25  on the plaintiff engaging in a protected activity"); *Silva v. City of Hidalgo, Tex.*, 575 F. App'x

26  419, 426 (5th Cir. 2014) ("[plaintiff's] own allegation is fatal to her claim because she asserts

27  only that 'she was terminated in part because she rejected the sexual advances [] and because she

28  made [] reports []'").

1    Critically, plaintiff here fails to allege that the adverse actions "would not have occurred

2    in the absence of—that is, but for—" his protected activity.  *Nassar*, 570 U.S. at 346–47.  In

3    *Nassar*, the Supreme Court clarified that the heightened standard of but-for causation applies to

4    Title VII retaliation claims, not the lesser "motivating factor" standard, which applies to status-

5    based discrimination claims.  *Nassar*, 570 U.S. at 360.  But even under that lesser standard, a

6    plaintiff must allege that the discrimination was "a motivating factor for any employment

7    practice, even though other factors also motivated the practice."  *Nassar*, 570 U.S. at 348–49.  By

8    merely alleging that his protected activity was *a* factor, plaintiff Albro has not even satisfied the

9    lesser standard of alleging his protected activity was a "motivating factor" for the adverse action.

10   It follows that plaintiff's allegations do not satisfy the heightened but-for causation standard as

11   required for Title VII retaliation claims pursuant to the decision in *Nassar*.

12             *b.      Inference of Causation Based on Temporal Proximity*

13   A plaintiff may establish a causal link between the protected activity engaged in and the

14   adverse action taken by circumstantial evidence, including the employer's knowledge of the

15   protected activity and the proximity in time between the protected action and the adverse

16   employment act.  *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988); *see also Van Asdale v.*

17   *Int'l Game Tech.,* 577 F.3d 989, 1003 (9th Cir. 2009) ("[C]ausation can be inferred from timing

18   alone where an adverse employment action follows on the heels of protected activity.") (quoting

19   *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir. 2002)); *Passantino*, 212 F.3d

20   at 507 ("[W]hen adverse employment decisions are taken within a reasonable period of time after

21   complaints of discrimination have been made, retaliatory intent may be inferred").

22   Here, the length of time between plaintiff's complaints in March and June 2015 and

23   Bechtel's decision in February 2016 to uphold Wheelock's proposed suspension of plaintiff—a

24   span of eight to eleven months—does not suggest that the February 2016 actions "follow[ed] on

25   the heels of [plaintiff's] protected activity" under the circumstances in this case.  *See Villiarimo*,

26   281 F.3d at 1065.  As the Ninth Circuit has explained, "a rule that any period over a certain time

27   is per se too long (or, conversely, a rule that any period under a certain time is per se short

28   enough) would be unrealistically simplistic."  *Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th

1   Cir. 2003); *see also Howard v. City of Coos Bay*, 871 F.3d 1032, 1046 (9th Cir. 2017).  Under

2   some circumstances an eight-month gap in time may be too great to allow the inference of a

3   causal link.  *See Cornwell v. Electra,* 439 F.3d 1018, 1035–36 (9th Cir. 2006) (gap of eight

4   months was too great to support an inference that a complaint was related to the termination); *see*

5   *also Manatt v. Bank of Am., NA,* 339 F.3d 792, 802 (9th Cir. 2003) (nine-month lapse between

6   protected activity and alleged retaliatory employment decision was too long to infer causation).

7   Under other circumstances, however, even a gap of eleven months may not be too great to allow

8   for such an inference.  *See Allen v. Iranon,* 283 F.3d 1070, 1078 (9th Cir. 2002) ("[A]n eleven-

9   month gap in time is within the range that has been found to support an inference that an

10  employment decision was retaliatory.").[12]

11         Moreover, to support an inference of causation based on temporal proximity, a plaintiff

12  must show that the particular decision makers involved in the adverse employment action knew

13  of plaintiff's protected activity.  *See Reed v. Avis Budget Grp., Inc*., 472 F. App'x 525, 526 (9th

14  Cir. 2012) (citing *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) ("Essential to a

15  causal link is evidence that the employer was aware that the plaintiff had engaged in the protected

16  activity.")).[13]  Here, plaintiff does not respond to defendant's argument that he has failed to allege

17  that the decision makers in his adverse employment actions—Bechtel (who upheld plaintiff's

18  suspension in February 2016) and Wheelock (who reassigned plaintiff in February 2016)—were

19  aware that plaintiff had complained to Farris and Davis in March and June of 2015.  Thus, the

20  court is not inclined to infer causation under these circumstances.  *See Cooper v. Cate*, No. 1:10-

21  cv-899-AWI-DLB, 2012 WL 1669353, at *9 (E.D. Cal. May 11, 2012) (dismissing retaliation

22  claim where there were "no allegations that the specific individuals who inflicted the particular

---

23

24  [12]  However, the court in *Allen* clarified that in that case, "an inference from temporal proximity would have been stronger had the gap in time been smaller," and that its ultimate finding that defendants retaliated against the plaintiff was based on the defendants' misrepresentations of the events leading up to the adverse action and the defendants' knowledge of the plaintiff's protected activity; the court did not rely on temporal proximity.  *Allen*, 283 F.3d at 1078.

25

26

27  [13]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

28

adverse employment actions on [plaintiff] had actual knowledge of [his] protected activities" explaining that "[w]ithout actual knowledge of protected activity by the individual who causes an adverse employment action to occur, there can be no retaliation").[14]

In sum, the court finds that plaintiff has not sufficiently alleged a causal link between his protected activity and the adverse employment actions that he suffered.  He did not allege but-for causation, and the eight- to eleven-month gap between his protected activity and the adverse actions does not support an inference of causation based on temporal proximity alone because he did not allege that the decision-makers were aware of his protected activity.

Thus, the court will dismiss plaintiff's retaliation claim.  As noted above, plaintiff has already had an opportunity to amend his complaint and has failed to correct the previously noted deficiencies.  Moreover, and as noted above with respect to his disparate treatment claim, plaintiff has not requested leave to amend his FAC as to either claim.  Rather, plaintiff's counsel has simply argued that the allegations of the FAC are sufficient to state cognizable claims.  Under these circumstances the court concludes that the granting of further leave to amend would be futile with respect to plaintiff's retaliation claim as well.  *See Ecological Rights Found.*, 713 F.3d at 520; *see also Cooper*, 2012 WL 1669353, at *13.

/////

/////

_____

[14]  Plaintiff also does not respond to defendant's argument that an inference of causation based on temporal proximity does not arise here because plaintiff's allegations suggest an "obvious alternative explanation."  (Doc. No. 32-1 at 14.)  Specifically, defendant argues that Bechtel's and Wheelock's actions in February 2016 "merely implemented" the proposed suspension, which flowed from Long's report finding a number of instances of purported wrongdoing by plaintiff.  (*Id.*)  It is true that "[w]hen considering plausibility, courts must also consider an 'obvious alternative explanation' for defendant's behavior."  *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (citing *Iqbal*, 556 U.S. at 682) (quoting *Twombly*, 550 U.S. at 567); *see also Capp v. Cty. of San Diego*, 940 F.3d 1046, 1055 (9th Cir. 2019) (noting the Supreme Court's "admonition that an allegation is not plausible where there is an 'obvious alternative explanation' for alleged misconduct") (quoting *Iqbal*, 556 U.S. at 682).  Nonetheless, the court is not persuaded by defendant's argument in this regard here.  Defendant's logic is based on the fact that the Long report and notice of proposed suspension occurred *before* plaintiff engaged in the EEO process and thus provide an obvious alternative explanation for the adverse actions.  But defendant's logic does not hold true for the protected activity that occurred in March and June 2015, *before* the Long report and proposed suspension.

23

1

**CONCLUSION**

2   For the reasons set forth above, defendant's motion to dismiss (Doc. No. 32) is granted

3 without further leave to amend and the Clerk of the Court is directed to close this case.

4 IT IS SO ORDERED.

5  Dated: **April 21, 2020**   _____

6          UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28