PHILLIP A. TALBERT
United States Attorney
W. DEAN CARTER
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
E-mail:        dean.carter@usdoj.gov
Telephone:  (916) 554-2781
Facsimile:   (916) 554-2900

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM ALBRO,<br><br>             Plaintiff,<br><br>        v.<br><br>CARLOS DEL TORO, Secretary of the United States Department of the Navy,<br><br>             Defendant. | No. 1:18-CV-01156-ADA-CDB<br><br>DATE :    July 24, 2023<br>TIME  :   10:30 a.m.<br>CTRM :   1, 8th Floor<br>JUDGE:   Honorable Ana de Alba |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.   INTRODUCTION .................................................................................................................1

II.  BACKGROUND ..................................................................................................................1
    A.  Albro and Washburn as co-workers. .........................................................................1
    B.  January – June 2015: Davis investigates the workplace environment of the Combustion Science Branch. ...................................................................................2
    C.  June 2015 – October 2015: Wheelock orders an independent management inquiry after Albro's behavior continues. ..................................................................4
        1.  *Albro made derogatory remarks about the LDS Church and its members.* ......................................................................................................5
        2.  *Albro made inappropriate offensive comments to a transgender individual.* .......................................................................................................6
        3.  *Albro impeded his co-workers' research by refusing to share equipment.* ......................................................................................................6
        4.  *Albro was insubordinate and failed to follow his supervisors' instructions.* ....................................................................................................7
    D.  October 2015 – February 2016: Wheelock proposes suspending Albro, who then files a complaint with the Navy's EEO office. ................................................7
    E.  Albro files two complaints under Title VII, both of which are dismissed. ...............8
    F.  Albro appeals; the Ninth Circuit affirms in part and remands. .................................9

III. STATEMENT OF UNDISPUTED FACTS ........................................................................9

IV.  LEGAL STANDARDS ......................................................................................................10
    A.  Summary Judgment .................................................................................................10
    B.  Title VII ...................................................................................................................11

V.   ARGUMENT .....................................................................................................................12
    A.  Albro has not established a prima facie case of discrimination. ............................12
    B.  The Navy had a legitimate, nondiscriminatory reason for disciplining Albro. ......12

VI.  CONCLUSION ..................................................................................................................14

I.    **INTRODUCTION**

Plaintiff William Albro works as a research chemist for the United States Department of the Navy in China Lake, California. In 2015, Albro's co-workers reported that he had made insulting remarks about the Church of Jesus Christ Latter Day Saints ("LDS Church"), was impeding the work of his co-workers by refusing to share equipment, and had referred to a transgender employee as "he/she/it" during a meeting. The Navy investigated, substantiated the allegations, and took remedial action by suspending Albro and reassigning him to a new branch in February 2016. Shortly after he was notified that he was to be disciplined for his actions, Albro filed a complaint with the Navy's Equal Employment Opportunity ("EEO") office alleging that the Navy discriminated against him because he was not a member of the LDS Church.

After the EEO proceedings concluded, Albro filed this action which currently consists of a single disparate-treatment claim brought under Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e-16. In this claim, Albro alleges that the Navy discriminated against him when it suspended and reassigned him because he is not a member of the LDS Church.

Judgment should be entered on behalf of the Secretary. The Navy had legitimate, nondiscriminatory reasons for disciplining Albro. Not only did his co-workers report numerous occasions where Albro had made offensive remarks and had undermined or demeaned them, but he also made derogatory remarks about LDS members directly to two of the investigators on two separate occasions. Moreover, it is undisputed that none of the investigators or decisionmakers were LDS members. The only person in Albro's chain of command who was LDS was Ephraim Washburn, Albro's first-level supervisor, and aside from being interviewed during the investigations, the undisputed facts show that Washburn played no role in the decision to suspend Albro and reassign him to a new supervisor.

II.    **BACKGROUND**

A.    **Albro and Washburn as co-workers.**

In 2006, Plaintiff William "Rick" Albro was hired by the Navy's Naval Air Warfare Center Weapons Division ("NAWCWD") in China Lake, California, which is a component of the Navy that

researches, develops, and tests new weapon systems. ECF No. 28 ¶ 9.[1] Albro was hired to work as a research chemist in the Combustion Sciences Branch, which is a subcomponent of the Energetics Research Division. Joint Statement of Undisputed Facts ("JSUF") ¶¶ 1,3; *see also* Declaration of Kristen McLeod ("McLeod Decl."), Ex. A at 360 (EEO Record of Investigation). Among his co-workers at the time was Ephraim Washburn, another researcher who was hired in 2004. Washburn Dep. 10:1-8.

As co-workers, Albro and Washburn's relationship was professional and friendly. In or around 2007, Albro's wife, Mary Albro, began attending church with her friend, who was LDS and also a member of the same congregation as Washburn. Washburn Dep. 31:20-32:7. Mary Albro asked Washburn to baptize her and, in December 2007, Washburn baptized her into the LDS Church. Washburn Dep. 94:20-25. Shortly before or after the baptism, the Albros moved and were no longer part of the same congregation as Washburn. *Id.* However, the Washburn and Albro families remained friendly; in 2008, Washburn and Albro travelled together with their families through France while there for work. Washburn Dep. 27:6-25.

In 2012, the head of the Combustion Sciences Branch, who was Albro and Washburn's first-level supervisor, retired. Washburn Dep. 59:6-14. Both Albro and Washburn applied for the vacant Branch Head position and Washburn was hired instead of Albro. McLeod Decl. Ex. A at 700.

**B.   January – June 2015: Davis investigates the workplace environment of the Combustion Science Branch.**

After Washburn became the Branch Head, the relationship between Washburn and Albro deteriorated over the next two years and, by early 2015, Albro refused to speak with Washburn. Washburn Dep. 58:2-19, 85:15-87:10. Jeffrey Davis, Washburn's first- and Albro's second-level supervisor, became aware of problems in the branch after at least two separate incidents. Around January 2015, there was an accident involving a lockout of a safe used by Albro which contained explosives. Farris Dep. 30:5-32-13. Around the same time, Albro also accused Washburn of

---

[1] *See also* About NAWCWD, https://www.navair.navy.mil/nawcwd/About-NAWCWD (last visited May 24, 2023).

1  unprofessional behavior, such as claiming that Washburn had not invited Albro to a division-wide
2  holiday party.  *Id.*; Davis Dep. 39:22-40:18; McLeod Decl. Ex. A at 705.
3       Davis first requested that Albro and Washburn attend mediation to try and resolve their
4  differences.  Davis Dep. 62:2-63:10.  After mediation was unsuccessful, Davis contacted Christine
5  Farris, an employee in human resources, and requested that she assist him in conducting an informal
6  inquiry of the Combustion Science Branch.  Farris Dep. 30:5-32:13.  As part of this investigation, Davis
7  and Farris interviewed Albro, Washburn, and several of Albro's co-workers.  McLeod Decl. Ex. A at
8  451.  When asked about the workplace environment, nearly all of the co-workers interviewed mentioned
9  that Albro was the source of tensions in the Branch.  For example, when asked whether Washburn was
10 creating tension in the Branch, one co-worker responded: "No.  He actually makes it inclusive . . . .
11 tension only relates to Rick[.]"  Declaration of Christine Farris ("Farris Decl.") Ex. J at 1.  Likewise,
12 when asked whether he would be comfortable going to anyone in the group with concerns, another co-
13 worker replied: "To be honest the only person I wouldn't go to is Rick.  Redeeming qualities.  Wasn't
14 very nice."  Farris Decl. Ex. H at 2.  Another co-worker complained that there was "[s]o much lack of
15 respect by Rick of Ephraim's authority."  Farris Decl. Ex. G at 2.  Finally, there are indications that
16 Albro had already been making offensive remarks relating to religion to his co-workers.  *See* Farris
17 Decl. Ex. I at 3 (co-worker heard Albro exclaim that "these Mormons are trying to steal my wife away
18 from my family.").
19       During Albro's interview, it became apparent to Davis and Farris that Albro was making
20 inappropriate remarks in the workplace.  When Davis and Farris met with Albro on March 5, 2015,
21 Albro reiterated his accusation that Washburn had engaged in unprofessional behavior to Davis and
22 Farris and informed them that he believed it was related to Washburn being a member of the LDS
23 Church.  *Id.* at 745; *see also* Farris Decl. Ex. F (Farris' notes of Davis' March 2015 interview with
24 Albro).  He also told Davis and Farris that Washburn had baptized his wife and described LDS Church
25 baptisms in the following manner:

26  > [The baptism] looks like its videotaped.  It's a wet t-shirt contest.  Very
   > inappropriate. . . . I'm sorry but white robes are see-through [and they]
27 > don't wear clothes underneath.  Wet t-shirt contest.

28 Farris Decl. Ex. F at 11; *see also* McLeod Decl. at 705, 745; Davis Dep. 51:14-19.

MEMORANDUM OF POINTS AND AUTHORITIES IN            3
SUPPORT OF MOTION FOR SUMMARY JUDGMENT

By June 2015, Davis concluded his informal inquiry and informed Albro that his interviews of Albro's co-workers did not corroborate Albro's claims of unprofessional behavior by Washburn. McLeod Decl. Ex. A at 464. Instead, based on his interviews with Albro's co-workers, Davis became concerned that Albro's behavior was creating problems in the Combustion Sciences Branch. *Id.* Specifically, Davis concluded that Albro: (1) was not following the chain of command, *id.*; (2) had been unprofessional in his behavior regarding the sharing of equipment with co-workers, *id.* at 464, 703; (3) was making "degrading comments" about co-workers and management, *id.* at 464-65; and (4) engaged in a pattern of making unfounded accusations about co-workers and management, *id.* at 465; *see also id.* at 703-04. Davis instructed Albro to cease any inappropriate behavior. *Id.* at 464. Furthermore, Davis reminded Albro that he was required to follow the chain of command, and specified that "[w]hen someone above you in the chain such as a Department Head, Division Head, or Branch Head gives instructions it is expected that this instruction is carried out." *Id.*

Of note, neither Davis nor Farris are members of the LDS Church. JSUF ¶ 9. Aside from being interviewed as part of the investigation, there is no evidence that Washburn had any impact on or influence over Davis' investigation.

C. **June 2015 – October 2015: Wheelock orders an independent management inquiry after Albro's behavior continues.**

Instead of heeding Davis' request to cease insubordinate behavior, Albro did the opposite. On June 30, 2015, Davis and Washburn confronted Albro about locks he had installed to prevent access to gas bottles used by the branch for research experiments. McLeod Decl. Ex. A at 466; *see also id.* at 704. Davis and Washburn requested that Albro remove the locks. *Id.* Albro refused and, instead of removing the locks or giving his supervisors access to the keys, he instead left for the day. *Id.* at 467.

In July 2015, Gregory Wheelock, Albro's third-level supervisor, requested that human resources conduct a formal management inquiry into Albro's conduct. JSUF ¶ 12. Robert Long, a Division Head outside of Albro's chain of command, was asked to conduct the inquiry. JSUF ¶ 13. In essence, the purpose of Long's inquiry was to investigate reports that Albro had made inappropriate comments about religion, made inappropriate comments to a transgender individual, avoided lab inspections, prevented

co-workers from using equipment, and had inappropriately locked gas bottles.[2] *See* Declaration of Christine Farris ("Farris Decl."), Ex. B at 1. Long interviewed twelve individuals, including Albro, Washburn, Davis, and many of Albro's co-workers, and collected evidence such as emails from interviewees. *Id.* Long ultimately concluded that Albro had engaged in most of the misconduct reported to him.[3] *Id.* at 1-13.

### 1. Albro made derogatory remarks about the LDS Church and its members.

Multiple individuals reported to Long that Albro made inappropriate religious comments about the LDS Church and religion. Indeed, Long noted that "multiple employees indicated they were aware of Dr. Albro's dislike/approval of the Mormon Church; one employee indicated he hadn't been aware that other members of the group belonged to the Mormon Church until Dr. Albro told him so." Farris Decl. Ex. B at 6-7.

For example, Trevor Hedman, a co-worker who belonged to the LDS Church, reported the following:

> 1. While a few team members were eating lunch at work in spring 2013, Dr. Albro made a comment to Dr. Hedman that his lunch should be monkey brains; when Dr. Hedman asked what he meant, Dr. Albro said he was reading scripture and "your religion says you should eat fruit of the tree and that's monkey brains."

Long listed several additional instances of inappropriate remarks:

- Albro told Long during his interview that "Mormon baptisms were nothing short of a wet t-shirt contest," Farris Decl. Ex. B at 6;
- Another of Albro's co-workers, Clare Dennis, reported that Albro would claim at work that the LDS Church was attempting to kidnap his daughter, *id.* at 7;
- Albro told an individual outside of his branch, Megan Rex,[4] that one of his co-workers who was a member of the LDS Church had beaten his ex-wife and had given her a black eye, *id.*

---

[2] During the inquiry, Long discovered that another employee had made homophobic remarks about Alana Spurling, Albro and Pate's employee who was transgender, as well as Jeffrey Davis. Farris Decl. Ex. B at 11-12. Mr. Pate was given a three-day suspension as a penalty, which was held in abeyance due to his retirement. *See* McLeod Decl. Ex. A at 457.

[3] Long did not conclude that Albro had avoided lab inspections or falsified documents and data. Farris Decl. Ex. B at 1, 5-6.

[4] Neither Clare Dennis nor Megan Rex are members of the LDS Church.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

5

    2. *Albro made inappropriate offensive comments to a transgender individual.*

  Long also found that Albro made inappropriate remarks about a transgender individual. One of Albro's co-workers within the Branch, Alana Spurling, had recently transitioned to female and began using the name of "Alana" rather than her old name, "James." Farris Decl. Ex. B at 7. Spurling complained to Long that Albro would refer to her as "James," despite knowing that she preferred to go by Alana, and also referred to her as "him/her" in email traffic:

> 1. Dr. Albro continued to regularly refer to Alana Spurling as "James" and use male pronouns leading up to our interview in August. Ms. Spurling provided email traffic from the May-June timeframe, at which point she was signing her emails as "Alana" and dressing as a female; in the email traffic, Dr. Albro referred to her as "James" and "him/her".

*Id.*; *see also* McLeod Decl. Ex. A at 629 (email where Albro refers to Alana Spurling as "him/her" and "James"). Moreover, Albro reportedly also referred to Spurling during a meeting as "'he, she, it,' and then chuckled." Farris Decl. Ex. B at 7-8; *see also* McLeod Decl. Ex. A at 627-28 (declaration of Alana Spurling), Farris Decl. Ex. M at 3 ("[Albro] calls Alana 'James' continually [without] self-correcting. [Albro] [s]aid 'he,' 'she,' 'it.'").

    3. *Albro impeded his co-workers' research by refusing to share equipment.*

  Long reported that Albro "treats many of his peers as being incompetent," and would often be "untruthful and misleading" in an effort to prevent equipment from being used by others within his branch. Farris Decl. Ex. B at 3. Again, Long gave specific examples to support in his findings. Specifically:

- "Multiple employees reported that one reason Dr. Albro gives when asked to lend equipment was that NCIS would come after him and/or the government would drain his personal bank accounts if he didn't account for all the equipment in his name," *id.* at 3;
- On one occasion, Albro required an employee to provide him with a test plan before lending out equipment, *id.*;
- A colleague asked Albro if he could "borrow diode lasers. Dr. Albro declined, saying that he didn't have any. Another colleague found the diode lasers in a drawer in Dr. Albro's lab." *Id.* at 4.

    4. *Albro was insubordinate and failed to follow his supervisors' instructions.*

Long likewise substantiated claims that Albro had locked up gas bottles and further found that Albro had been insubordinate on multiple occasions. For example, he noted that Albro had placed locks on gas bottles for use by the branch and "refused to remove the locks . . . when he was directed to do so by Dr. Washburn and Dr. Davis[.]" Farris Decl. Ex. B at 10. He also reported that Albro would refuse to allow co-workers to use equipment, such as a micro drill, even after directed to do so by Washburn. *Id.*

In concluding his report, Long recommended that appropriate administrative action be taken for Albro's misconduct, that the entire team undergo team building exercises, and further that Davis and Washburn would benefit from additional training to deal with difficult employees. *Id.* at 12-13.

Of note, Long is not a member of the LDS Church. JSUF ¶ 14. Aside from being interviewed as part of the investigation, there is no evidence that Washburn had any impact on or influence over Long's investigation.

  **D.** **October 2015 – February 2016: Wheelock proposes suspending Albro, who then files a complaint with the Navy's EEO office.**

On October 8, 2015, Long submitted his report to Greg Wheelock, Albro's third-level supervisor. Farris Decl. Ex. B at 1. After reviewing Long's report, Wheelock issued a Notice of Proposed Suspension on December 9, 2015, which formally charged Albro with unprofessional conduct, failure to follow instructions from a supervisor, and discrimination based on protected status. McLeod Decl. Ex. A at 580-88. Wheelock proposed that Albro be suspended for seven days and further notified him that he would be reassigned to a new branch to work under a new supervisor. *Id.* at 580, 587. Wheelock met with Albro to explain his Notice and submitted the Notice to Charles Bechtel, Albro's fourth-level supervisor and the official responsible for issuing a decision on the Notice. *Id.* at 725.

Albro submitted a lengthy response to Wheelock's Notice on January 11, 2016, which Bechtel considered as part of his decision. *Id.* at 589; *see also id.* at 38-39. On February 18, 2016, Bechtel decided to adopt Wheelock's Notice and formally decided that Albro would be suspended for seven days.[5] *Id.* at 589-91. After Bechtel adopted the suspension, Wheelock notified Albro on February 23,

---

[5] Bechtel's suspension decision was later reduced to four days after Albro administratively

2016, that, pursuant to his Notice, Albro would be reassigned to the Solid Propulsion and Energetics Branch. *Id.* at 615; *see also* JSUF ¶ 2.

Of note, neither Wheelock nor Bechtel are members of the LDS Church. JSUF ¶¶ 14, 19. There is no evidence that Washburn had any impact on or influence over Wheelock's Notice or Bechtel's decision. *See, e.g., id.* at 715.

After Wheelock issued his Notice but before Bechtel issued a decision, Albro contacted the Navy's Equal Employment Opportunity ("EEO") office to complain about discriminatory behavior on January 19, 2016. *Id.* at 3. On April 18, 2016, Albro submitted a formal complaint of discrimination to the EEO office which alleged that Wheelock's December 9, 2015, Notice and Bechtel's decision were discriminatory actions taken because of Albro's refusal to join the LDS Church. *Id.* at 4-6.

E. **Albro files two complaints under Title VII, both of which are dismissed.**

In his original complaint initiating this action, Albro alleged three causes of action under Title VII based on his non-affiliation in the LDS Church: (1) disparate treatment; (2) hostile work environment; and (3) retaliation. ECF No. 1. After the Secretary moved to dismiss the complaint, the Court dismissed the hostile work environment claim as untimely and dismissed the retaliation claim with leave to amend. ECF No. 27. The Court dismissed the disparate-treatment claim with prejudice to the extent it was based on incidents that occurred more than forty-five days prior[6] to Albro's initial contact with the EEO Office on January 19, 2016. *Id.* at 7-9. However, because Wheelock's Notice of Proposed Suspension, Bechtel's imposition of the suspension, and Albro's reassignment to a new group all occurred within forty-five days of Albro's contact with the EEO office, the Court permitted Albro to amend his complaint to the extent he sought to base his disparate-treatment claims on these three events. *Id.* at 9-12.

---

appealed, but the reviewing official otherwise agreed with Bechtel's decision. McLeod Decl. Ex. A at 592-94.

[6] To be actionable, a federal employee must notify an EEO counselor of discriminatory conduct within forty-five days of the alleged conduct. *Sommatino v. United States*, 255 F.3d 704, 708 (9th Cir. 2001). Because Albro's original complaint contained numerous allegations of conduct that occurred months or years prior to initial contact, the Court dismissed Albro's disparate treatment claim with prejudice to the extent the claim was based on this conduct. ECF No. 27 at 7-9.

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT

8

Albro subsequently filed an amended complaint asserting a disparate treatment claim and a retaliation claim. ECF No. 28. As per the Court's order, Albro's amended complaint alleged that he was subjected to disparate treatment and retaliation with respect to events that occurred on or after December 9, 2015. *See* ECF No. 28 ¶¶ 134-63. After the Secretary moved to dismiss, the Court dismissed Albro's amended complaint in its entirety. ECF No. 47.

### F. Albro appeals; the Ninth Circuit affirms in part and remands.

Albro appealed the dismissal of his amended complaint to the Ninth Circuit. ECF No. 49. The Ninth Circuit affirmed the dismissal of Albro's retaliation claim but remanded with respect to the disparate-treatment claim. *See* ECF No. 57.

Consequently, the only claim at issue in this lawsuit is Count I of the amended complaint – Albro's disparate-treatment claim. *Id.*; *see also* ECF No. 28 ¶¶ 134-50. Albro's claim alleges that the Navy took the following actions "based on Albro's non-membership in the LDS Church:"[7]

1. Wheelock and Farris issued a Notice of Proposed Suspension to Albro on December 9, 2015;
2. Bechtel sustained the suspension on February 16, 2016; and
3. The Navy reassigned Albro to a new branch on February 23, 2016, allegedly resulting in less equipment, funding, and more bureaucratic "constraints."

### III. STATEMENT OF UNDISPUTED FACTS

In addition to the parties' Joint Statement of Undisputed Facts filed separately, the Secretary offers the following statement of material facts not in dispute:

- As a result of his informal management inquiry, Davis concluded that Albro: (A) was not following the chain of command; (B) had been unprofessional in his behavior regarding the sharing of equipment with co-workers; (C) was making degrading comments about co-workers and management; and (D) engaged in a pattern of making unfounded accusations about co-workers and management. McLeod Decl. Ex. A at 464-65, 703.
- As a result of his formal management inquiry, Long concluded that Albro engaged in the following: (1) Inappropriate conduct regarding equipment ownership/use of lab equipment;

---

[7] *See* ECF No. 28 ¶¶ 134-50.

(2) inappropriate conduct regarding the locking of gas bottles; (3) making inappropriate religious comments to coworkers; (4) making inappropriate references to a transgender individual; (5) deceiving/attempting to deceive management; (6) refusal to comply with management requests; and (7) insubordinate/disrespectful conduct toward supervisors. Farris Decl. Ex. B at 1-13.

- Albro is not aware of anything Bechtel or Wheelock have said or done that suggests they are biased against non-members of the LDS Church.  Albro Dep. 163:20-164:11.

### IV.     LEGAL STANDARDS

#### A.     Summary Judgment

Summary judgment is appropriate when "no genuine dispute as to any material fact" requires trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When considering a summary judgment motion, the Court must examine all of the evidence in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). If, as here, the moving party does not bear the burden of proof at trial, it may discharge the burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing of an element of his case with respect to which he has the burden of proof. *Id.* at 323; *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102, 1106 (9th Cir. 2000).

Once the Secretary meets the requirements of Rule 56, the burden shifts to the plaintiff to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). He may not "rest on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 259. Instead, he must go beyond the pleadings to designate specific facts showing the existence of genuine issues for trial. *Celotex*, 477 U.S. at 324-25.

A genuine issue exists only when a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247-49. To demonstrate a genuine issue, the plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586-87; *see Foster v. Arcata Associates, Inc.*, 772 F.2d 1453, 1459 (9th Cir. 1985) (the role of summary judgment in discrimination cases "is to enable the district courts to identify meritless suits and dispense with them short of trial"). "[T]he moving party is entitled to a judgment as a matter of law" when the nonmoving party fails to make a sufficient showing on an essential element of its case. *Celotex*, 477 U.S. at 323; *Nissan Fire & Marine*, 210 F.3d at 1102.

### B. Title VII

Title VII claims are analyzed using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). Under this approach, plaintiff bears the initial burden of establishing a prima facie case before there is any duty by a defendant to defend. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

However, merely stating a prima face case does not suffice to save a Title VII claim from summary judgment. *Burdine*, 450 U.S. at 254; *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994) ("the mere existence of a prima facie case . . . does not preclude summary judgment"). Instead, stating a prima facie case simply shifts the burden to the employer to produce evidence demonstrating "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citation omitted).

Once the employer has articulated a legitimate, non-discriminatory reason for the employment action, the presumption of discrimination "drops from the case." *Id.* A plaintiff must then prove not only that the proffered legitimate reason is false, but also that intentional discrimination was the true reason for the adverse personnel action. *Id.* at 515. To avoid summary judgment, a plaintiff's evidence of pretext must consist of "sufficiently specific facts." *Collings v. Longview Fibre Co.*, 63 F.3d 828, 834 (9th Cir. 1995); *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996); *Wallis*, 26 F.3d at 890. Evidence to support a prima facie case of discrimination alone is not sufficient to show pretext. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093-94 (9th Cir. 2001) ("[S]ufficient evidence to support an inference of discrimination . . . is not sufficient to raise a genuine issue of material fact regarding the truth of [defendant's] proffered nondiscriminatory reasons . . .").

V.     **ARGUMENT**

**A.     Albro has not established a prima facie case of discrimination.**

To establish a prima facie case of disparate treatment, a plaintiff must establish that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position in issue; (3) the plaintiff suffered an adverse employment decision; and (4) one or more employees outside the protected class with comparable qualifications and work records did not suffer similar adverse employment decisions. *McDonnell Douglas Corp.*, 411 U.S. at 802; *see also White v. Pac. Media Grp., Inc.*, 322 F. Supp. 2d 1101, 1110 (D. Haw. 2004).  In the context of a reverse religious discrimination claim, "the 'protected class' showing required in a traditional race or sex discrimination claim does not apply[.]" *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007).

With respect to the last prong, it is undisputed that Albro cannot identify a similarly situated employee that was treated more favorably based on membership in the LDS Church.  "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1160 (9th Cir. 2010) (citing *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) (finding employee not similarly situated if he "did not engage in problematic conduct of comparable seriousness" to plaintiff's conduct)).  Albro has not and cannot identify an employee who has engaged in similar problematic conduct who was not punished.

**B.     The Navy had a legitimate, nondiscriminatory reason for disciplining Albro.**

Even if the Court finds that he has established a prima facie case of discrimination, Albro's disparate-treatment claim nevertheless fails because the Navy had a legitimate, nondiscriminatory reason for suspending Albro and transferring him to a new group.

Here, it is undisputed that Davis and Farris conducted an investigation in early 2015.  JSUF ¶ 8. The undisputed facts show that, as a result of the investigation, Davis concluded that Albro had engaged in inappropriate behavior.  McLeod Decl. Ex. A at 464-65, 703.  It is also undisputed that Wheelock requested a formal management inquiry after Davis concluded his inquiry and that Long, who was outside of Albro's chain of command, conducted this inquiry and submitted a written report to Wheelock.  JSUF ¶¶ 12, 13.  The undisputed facts show that Long concluded in his report that Albro had engaged in numerous acts of inappropriate conduct that warranted disciplinary action.  Farris Decl. Ex.

B at 1-13. Indeed, Albro described LDS baptisms as a "wet t-shirt contest" directly to Davis and Farris during an interview. *See* Farris Decl., Ex. F at 11.[8] Moreover, Long included a number specific examples of reported misconduct from numerous individuals who are not LDS. For example:

- Joseph Kalman complained of being "bullied" by Albro and stated that he was "unable to do his job" due to Albro's behavior, Farris Decl. Ex. B at 2;
- Clare Dennis reported that Albro would make outlandish and offensive claims about Washburn, such as that Washburn had planted a gun in Albro's office to get him in trouble, *id.* at 9;
- Alana Spurling reported that Albro had made offensive comments to her about her transgender status, *id.* at 7-8;

There is no dispute that Wheelock relied on this report in making his decision to recommend discipline for Albro and that Bechtel adopted Wheelock's Notice. JSUF ¶¶ 17-18, 20. Furthermore, it is undisputed that Davis, Farris, Long, Wheelock, and Bechtel are not members of the LDS Church. JSUF ¶¶ 9, 14, 19. Indeed, Albro admits that Wheelock and Bechtel had no underlying bias against non-members of the LDS Church when they took action to discipline Albro. Albro Dep. 163:20-164:11.

Finally, to the extent Albro relies on his own conclusory statements for why he was disciplined, such statements alone are not enough to establish a prima facie case or a discriminatory pretext. *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (courts may disregard self-serving declarations containing conclusions rather than facts) (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059 n.5, 1061 (9th Cir. 2002) (holding that the district court properly disregarded the declaration that included facts beyond the declarant's personal knowledge and did not indicate how she knew the facts to be true)); *F.T.C. v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."); *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) ("an employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact.").

---

[8] Notably, Albro also remarked during his deposition that Hedman would miss work because he had "eight grandmothers," implying that Hedman's family was polygamous. Albro Dep. 144:17-145:12.

Because the Navy had a legitimate, nondiscriminatory reason for suspending Albro and reassigning him to a new branch, and because Albro cannot establish the necessary elements to show disparate treatment, the Court should enter judgment on behalf of the Secretary.

## VI.     CONCLUSION

For the reasons set forth above, the Secretary of the Navy respectfully requests that the Court enter judgment on his behalf.

Dated:  June 15, 2023

PHILLIP A. TALBERT
United States Attorney

By:  /s/ *W. Dean Carter*
W. DEAN CARTER
Assistant United States Attorney