THE EMPLOYMENT LAW GROUP, P.C.
R. Scott Oswald (*pro hac vice*)
John T. Harrington (*pro hac vice*)
1717 K Street NW, Suite 1110
Washington, DC 20006
Telephone: 202-261-2806
Facsimile: 202-261-2835

ALEXANDER MORRISON & FEHR LLP
J. Bernard Alexander, III (State Bar No. 128307)
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone: 310.394.0888
310.394.0811 (facsimile)
balexander@amfllp.com
*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM ALBRO,<br><br>        Plaintiff,<br><br>    v.<br><br>CARLOS DEL TORO, Secretary of the United States Department of the Navy,<br><br>        Defendant. | Case No. 1:18-cv-01156-ADA-CDB<br><br><br>DATE:      July 24, 2023<br>TIME:      10:30 a.m.<br>CTRM:     1, 8th Floor<br>JUDGE:    Honorable Ana de Alba |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page No.**

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... iii

TABLE OF EXHIBITS ........................................................................................................... iv

INTRODUCTION ....................................................................................................................1

STATEMENT OF FACTS IN DISPUTE ...............................................................................3

LEGAL STANDARD ..............................................................................................................4

ARGUMENT ............................................................................................................................4

I.   Albro can show a *prima facie* case of discrimination under Title VII..............................4

   a.   The Secretary misstated the requirements for establishing a *prima facie* case for religious discrimination in the Ninth Circuit. ................................................................... 5

   b.   Albro has demonstrated other circumstances that give rise to an inference of discrimination by the Navy. ................................................................................................ 5

II.   Washburn used other management officials as his "cat's paws.".....................................9

   a.   The Secretary relies on disputed or distorted interpretations of facts to argue that the Navy had a legitimate non-discriminatory reason to discipline Albro. .................................9

     i.   Davis, in his informal fact-finding, credited only the reports that cast Albro in a negative light................................................................................................................. 10

     ii.   Long failed to investigate leads because doing so would have changed the outcome of his investigation. ...................................................................................................... 11

     iii.   Long made erroneous findings in his report. .......................................................... 13

     iv.   Long admitted bias against certain witnesses, and in favor of other witnesses, during the management inquiry. ...................................................................................... 13

     v.   Long assessed the credibility of witnesses against Albro in every instance........... 14

     vi.   Long failed to interview material witnesses. ......................................................... 14

     vii.   Long's claim that he drafted his report without help is disputed............................ 15

b.    Washburn's discriminatory animus was the reason for the adverse actions against Albro. ....................................................................................................................... 15

c.    The Secretary's proffered nondiscriminatory reason for disciplining Albro was pretextual.................................................................................................................... 16

III.    A reasonable jury could find that the Navy discriminated against Albro because of his non-membership in the LDS Church. ...................................................................... 16

a.    Direct evidence of religious discrimination is not required where a *prima facie* case is established................................................................................................................. 16

b.    Albro has shown a *prima facie* case of religious discrimination in violation of Title VII. 17

CONCLUSION...................................................................................................................17

# TABLE OF AUTHORITIES

**Page No.**

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) .................................................... 4

*Benuzzi v. Bd. of Educ.*, 647 F.3d 652, 662 (7th Cir.2011) .................................... 17

*Bodett v. CoxCom, Inc.*, 366 F.3d 736 (9th Cir. 2004) .......................................... 5, 17

*Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339 (6th Cir. 2012) ................................ 9

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) .......................................................... 17

*Ismail v. Amazon.com*, 2018 WL 2684391 (W.D. Wash. 2018) .................................... 5

*Mut. Fund Investors, Inc. v. Putnam Mgmt. Co., Inc.*, 553 F.2d 620 (9th Cir. 1977) .................. 4

*Noyes v. Kelly Servs.*, 488 F.3d 1163 (9th Cir. 2007) .................................................. 6

*Peterson v. Hewlett-Packard Co.*, 358 F.3d 599 (9th Cir. 2004) ................................ 5

*Scott v. Harris*, 550 U.S. 372 (2007) ............................................................................ 4

*Smith v. CRST Int'l, Inc.*, 2013 WL 3490647 ............................................................ 9

*Staub* v. *Proctor Hosp.*, 562 U.S. 411 (2011) ............................................................ 9

*Tolan v. Cotton*, 572 U.S. 650 (2014) .......................................................................... 4

*White v. Pac. Media Grp., Inc.*, 322 F. Supp. 2d 1101 (D. Haw. 2004) ........................ 5

**Statutes**

42 U.S.C. § 2000e-2(m) ............................................................................................ 17

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................. 4

**TABLE OF EXHIBITS**

**Exhibit 1.**    Robert Long's notes from interview with Rick Albro, 08/11/2015 (NAVY_000866-77)

**Exhibit 2.**    Christine Farris notes from Jeff Davis interview with Rick Albro, 03/05/2015 (NAVY_003445-57)

**Exhibit 3.**    Christine Farris notes from Jeff Davis interview with Dr. Spurling, 02/24/2015 (NAVY_003477-80)

**Exhibit 4.**    Christine Farris notes from Jeff Davis interview with Clare Dennis, 02/24/2015 (NAVY_003459-62)

**Exhibit 5.**    Christine Farris notes from Jeff Davis interview with Trevor Hedman, 02/26/2015 (NAVY_003468-70)

**Exhibit 6.**    Christine Farris notes from Jeff Davis interview with Thao Tran-Ngo, 02/24/2015 (NAVY_003481-84)

**Exhibit 7.**    Memo and Report from Management Inquiry by Robert Long, 10/08/2015 (NAVY_001056-77)

**Exhibit 8.**    EEOC Rebuttal Declaration of William "Rick" Albro, 09/22/2016 (NAVY_000648-91)

**Exhibit 9.**    Response to Notice of Proposed Suspension by William "Rick" Albro, 12/10/2015 (NAVY_000038-94)

**Exhibit 10.**   Notice of Proposal to Suspend, issued to William "Rick" Albro on 12/09/2015 (NAVY_000279-87)

**Exhibit 11.**   Email exchange between Charles Bechtel & William "Rick" Albro, 01/05/2016 (NAVY_000236-38)

**Exhibit 12.**   Email re WORKCENTER REALIGNMENT from Greg Wheelock, 02/23/2016 (NAVY_000615)

**Exhibit 13.**   EEOC Declaration by William "Rick" Albro, 09/19/2016 (NAVY_000635-47)

PLAINTIFF'S BRIEF IN OPPOSITION
TO SUMMARY JUDGMENT

**Exhibit 14.**    EEO Investigator's Report, 04/25/2016 (NAVY_000007-21)

**Exhibit 15.**    Baptism and Confirmation Certificate for Mary Kay Albro, 12/16/2007

(Albro0000580)

**Exhibit 16.**    Statement of Mary Albro re disassociation from LDS Church, 12/17/2015

(NAVY_000264)

**Exhibit 17.**    Response to Document Request for Complaint of William Albro

(NAVY_000645-596)

**Exhibit 18.**    Response to Pl. William Albro's Request for Admissions, Set One, by Def.

Carlos Del Toro, dated 05/06/2022

**Exhibit 19.**    EEOC Declaration of Trevor Hedman, 09/07/2016 (NAVY_000780-84)

**Exhibit 20.**    Robert Long's Management Inquiry interview notes, 07/28/2015 –

08/06/2015 (NAVY_000830-65)

**Exhibit 21.**    Summary of EEO Counseling Interview with William "Rick" Albro,

01/19/2016 (NAVY_000292-94)

**Exhibit 22.**    Pl.'s Answers [. . .] to Def.'s Interrogatories to Pl. William Albro, Set One,

07/22/2022

**Exhibit 23.**    EEO Declaration of Christine Farris, 09/19/2016 (NAVY_000738-47)

**Exhibit 24.**    EEO Declaration of Claresta Dennis, 09/01/2016 (NAVY_000748-54)

**Exhibit 25.**    Albro complaint and timeline regarding discrimination by Washburn

(NAVY_000274-76)

**Exhibit 26.**    Darlene Soto emails (NAVY_002917-53)

**Exhibit 27.**    Jeff Davis email to William "Rick" Albro, 06/23/2015 (NAVY_000239-41)

**Exhibit 28.**    Decision on Proposed Seven Day Suspension, 02/18/2016

(NAVY_000306-309)

**Exhibit 29.**    Declaration of William "Rick Albro, dated 07/12/2023

**Exhibit 30.**    Declaration of Mary Albro, dated 07/12/2023

**INTRODUCTION**

Plaintiff William "Rick" Albro, a career chemist working at Naval Air Weapons Station China Lake, was subjected to discrimination at work because he rebuffed the attempts of his supervisor to recruit him into the Church of Jesus Christ of Latter-Day Saints (LDS Church). Albro's supervisor, Ephraim Washburn, negatively affected Albro's career prospects, verbally abused and threatened him at work, and contributed to harassment of Albro by LDS missionaries who went to Albro's home and his daughter's school.

The Secretary mischaracterizes the events, first by attempting to frame Albro and Washburn as friends, and second by obfuscating the fact that both Dr. Jeffery Davis's informal fact-finding investigation and Robert Long's management inquiry occurred as the direct result of Albro's complaints of unprofessional behavior by Washburn. The Secretary does not dispute that Albro, prior to Long's inquiry, complained to Davis and HR Specialist Christine Farris of unprofessionalism by Washburn, though it claims Albro never complained about religious discrimination by Washburn until his complaint to the EEO.

The Navy then ignores that (1) China Lake has numerous LDS members at various levels within the organization, and (2) Washburn, through his own influence and his connections to those LDS members in management positions at China Lake, had the ability to interfere with Albro's career path and to enable the advancement of others. The Secretary fails to address Washburn's ability to use other managers and decisionmakers to enact his discriminatory animus towards Albro—to use those managers and other officials as his cat's paws.

Finally, mirroring the actions of both Davis and Long, the Secretary distorts and misinterprets Albro's words and actions and expects the Court to view them in the light most harmful to Albro. A glaring example of these distortions is in the Secretary's Memorandum of Points and Authorities in Support of Summary Judgment [ECF 78-1] at fn. 8. There, the Secretary mischaracterizes Albro's comments about what Albro considered excessive leaves of absences by Dr. Trevor Hedman, a member of the LDS Church, and the questionable credibility of those excuses, as an implication by Albro that Dr. Hedman's family is polygamous—an

PLAINTIFF'S BRIEF IN OPPOSITION
TO SUMMARY JUDGMENT

allegation that no one made until the Secretary asserted it in support of summary judgment. Albro never implied that Dr. Hedman's family is polygamous. The deposition testimony the Secretary points to is wholly mischaracterized and is quoted in full below to exhibit the Secretary's disingenuousness:

> 17 Q.  Did you work much with Trevor after he came back
> 18 as an employee after completing the SMART program?
> 19 A.   Not as much as should have been for -- certainly
> 20 not for recommendation to the certification. I think he
> 21 came back in like January of 2013 and between January and
> 22 maybe March, April, May time frame he had taken a number of
> 23 leaves to -- I think he had eight grandmothers that passed
> 24 away in that time frame and had to go on scouting outings
> 25 and campaign trips, things like that. He went off playing
> 1 golf with Brent Hedman at the golf course instead of working
> 2 on his -- on the projects and things that he was getting
> 3 paid for.
> 4 Q.    What do you mean by -- did you say eight
> 5 grandmothers?
> 6 A.    Yeah, eight.
> 7 Q.    How did he have eight grandmothers?
> 8 A.    That's a good question. I think he probably had
> 9 some people he considered his grandparents or close family
> 10 friends, but I don't think those are necessarily allowed in
> 11 the policy, but I think that's kind of an excuse like the
> 12 dog ate my homework.

Albro Dep. at 144:17-145:12. Importantly, the Secretary left out the next two lines because they did not fit the Agency's mischaracterization of Albro's comments:

> 13 Q.   Not really his grandmothers?
> 14 A.   That would be my guess, too.

Albro Dep. at 145:13-14.

The Secretary clarified with Albro what he meant, Albro explained it, and then the Secretary mischaracterized that statement and attributed the mischaracterization to Albro as though he said it himself. This type of distortion and mischaracterization was rampant in Davis's findings, in Long's report, and, now, in the Secretary's attempt to dispose of this case on summary judgment.

PLAINTIFF'S BRIEF IN OPPOSITION
TO SUMMARY JUDGMENT

As explained below, and in Plaintiff's Statement of Disputed Material Facts filed contemporaneously with this brief, there are numerous material facts in dispute that preclude summary judgment and require a jury trial to resolve Albro's claim of discrimination in violation of Title VII. The Secretary's Motion for Summary Judgment should be denied in its entirety.

## STATEMENT OF FACTS IN DISPUTE

Albro reproduces and disputes, or admits, those facts presented as undisputed[1] from the Secretary's motion as follows:[2]

(1)      As a result of his informal management inquiry, Davis concluded that Albro: (A) was not following the chain of command; (B) had been unprofessional in his behavior regarding the sharing of equipment with co-workers; (C) was making degrading comments about coworkers and management; and (D) engaged in a pattern of making unfounded accusations about co-workers and management.

Albro admits that the Secretary correctly states Davis's findings following the informal inquiry but disputes the propriety and veracity of those findings. *See* Plaintiff's Statement of Disputed Facts filed contemporaneously with this opposition.

(2)      As a result of his formal management inquiry, Long concluded that Albro engaged in the following: (1) Inappropriate conduct regarding equipment ownership/use of lab equipment; (2) inappropriate conduct regarding the locking of gas bottles; (3) making inappropriate religious comments to coworkers; (4) making inappropriate references to a transgender individual; (5) deceiving/attempting to deceive management; (6) refusal to comply with management requests; and (7) insubordinate/disrespectful conduct toward supervisors.

---

[1]      Local Rule 260(a) requires that "[e]ach motion for summary judgment . . . shall be accompanied by a "Statement of Undisputed Facts" that shall enumerate each of the specific material facts relied up on in support of the motion . . ." The Secretary did not enumerate those material facts upon which it purports to rely in its motion and instead provided a short bulleted list. Albro responds to the Secretary's "undisputed facts" in compliance with Local Rule 260(b) and enumerates them in the order they appear in the Secretary's Memorandum of Points and Authorities in Support of Motion for Summary Judgment [ECF 78-1].

[2]      Citations from the Secretary's brief are omitted.

Albro admits that the Secretary correctly states Long's findings following the management inquiry but disputes the propriety and veracity of those findings. *See* Plaintiff's Statement of Disputed Facts.

(3)     Albro is not aware of anything Bechtel or Wheelock have said or done that suggests they are biased against non-members of the LDS Church.

Admitted. But Albro submits that no discriminatory animus on the part of the decisionmakers is required when they act as the cat's paw on behalf of the management official who does possess discriminatory animus. Further, Albro has established that Washburn not only had discriminatory animus for Albro but used his influence over other management officials and decisionmakers to effect discrimination and discipline of Albro in furtherance of that animus.

## LEGAL STANDARD

A court should grant summary judgment only in an instance where "the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). A dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd,* 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.,* 673 F.3d 323, 330 (4th Cir. 2012)). "A material issue is one which may affect the outcomes of the litigation." *Mut. Fund Investors, Inc. v. Putnam Mgmt. Co., Inc.*, 553 F.2d 620, 624 (9th Cir. 1977).

Facts are considered material if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* at 247-48. The evidence must be reviewed in the light most favorable to the nonmoving party, and the court must draw all reasonable inferences in the nonmoving party's favor. *Tolan v. Cotton,* 572 U.S. 650, 656 (2014); *Scott v. Harris,* 550 U.S. 372, 378 (2007).

## ARGUMENT

**I.     Albro can show a *prima facie* case of discrimination under Title VII.**

PLAINTIFF'S BRIEF IN OPPOSITION
TO SUMMARY JUDGMENT

In the context of a disparate treatment claim based on religious discrimination, a plaintiff, to meet his *prima facie* burden, must show that (1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, **or other circumstances surrounding the adverse employment action give rise to an inference of discrimination**. *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004) (emphasis added); *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004) (plaintiff may show **either** that similarly situated individuals outside his protected class were treated differently, **or** other circumstances surrounding the adverse employment action give rise to an inference of discrimination) (emphasis added); *see also Ismail v. Amazon.com*, 2018 WL 2684391, at *12 (W.D. Wash. 2018).

### a. The Secretary misstated the requirements for establishing a *prima facie* case for religious discrimination in the Ninth Circuit.

As a preliminary matter, in its Memorandum of Points and Authorities in Support of Motion for Summary Judgment [ECF 78-1], the Navy misstates the law in the Ninth Circuit. Relying on *White v. Pac. Media Grp., Inc.*, 322 F. Supp. 2d 1101, 1110 (D. Haw. 2004), the Secretary asserts a plaintiff must identify "one or more employees outside the protected class with comparable qualifications and work records that did not suffer similar adverse employment decisions." Def.'s Memo. Supp. SJ [ECF 78-1] at 14. This is incorrect. Instead, a plaintiff *may* identify similarly situated individuals outside his protected class who were treated more favorably, *or* point to other circumstances surrounding the adverse employment action that give rise to an inference of discrimination. *Bodett*, 366 F.3d at 743; *Peterson*, 358 F.3d at 603; *see also Ismail*, 2018 WL 2684391 at *12.

### b. Albro has demonstrated other circumstances that give rise to an inference of discrimination by the Navy.

The Secretary does not dispute that Albro is (1) a member of a protected class; (2) that he is qualified for his position; or (3) that he suffered an adverse employment decision, and focused

only on the fourth element—which it misstated. The Secretary correctly points out that to prove his case for reverse religious discrimination, Albro is not required to prove he is a member of a protected class. Def.'s Memo. Supp. SJ [ECF 78-1] at 12 (citing *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007)). Therefore, to establish his *prima facie* case, Albro is only required to show circumstances that "give rise to an inference of discrimination."

The Navy began discriminating against Albro after he rebuffed Washburn's attempts to recruit him to join the LDS Church. Washburn was selected as branch head of the Combustion Sciences Branch before his predecessor, Fred Blomshield, retired through a deal Blomshield made with Merrill Beckstead because of Washburn's membership in the LDS Church. Albro Dep. at 39:24-41:12. Dr. Jeffery Davis, the hiring official for the Branch Head position, had an open and obvious friendship with Washburn. Albro Dep. at 50:23-51:3. Once Washburn became Albro's supervisor, JSUF [ECF 78-2] at ¶ 4, Washburn was in a position to discriminate against Albro for his rejection of Washburn's recruitment efforts and for Mary Albro's disassociation from the LDS Church.

After Mary Albro, Rick Albro's wife, disassociated from the LDS Church, the Albros needed an attorney to intervene on their behalf to stop continued harassment from the LDS Church. Albro Dep. at 36:7-17. Beginning immediately after Washburn became Albro's supervisor in 2013, Washburn changed the priorities of the Combustion Sciences Branch to be more modeling oriented, a change which negatively affected Albro's research. *Id.* at 47:18-49:6. Washburn knew these changes negatively impacted Albro. *Id.* at 53:20-25.

Washburn escalated his aggression towards Albro while himself taking cover under his position as Branch Head and claiming Albro was being insubordinate and refusing to follow the chain of command. For example, Washburn evicted Albro from his cubicle while Albro was on leave from December 2012 to January 2013 and assigned the space to an ESDP—an entry-level employee in the Navy's Engineer and Scientist Development Program. *Id.* at 42:1-13. Upon returning from leave, Albro found all his personal items from the cubicle missing; when he reported this to Washburn, Washburn told him, "tough; deal with it." *Id.* Washburn denies this

happened and claims he only reassigned Albro's cubicle after Albro was assigned an actual office. Washburn Dep. at 72:13-16; *see also* Pl.'s Statement of Disputed Facts at ¶ 37. Viewing these disputed facts in the light most favorable to Albro, a reasonable factfinder could infer animus towards Albro on Washburn's behalf.

In or around September or October 2013, Washburn tried to give Steve Son, a fellow member of the LDS Church, and certain French nationals a copy of a secret patent on which Albro was working. Albro Dep. at 70:4-15. Washburn was ultimately required to retake possession of the patent from Son. *Id.* at 70:16-22. The patent was based on Albro's research and giving it to Son and the French nationals was calculated by Washburn to undermine Albro's work. *Id.* at 73:9-17.

In or about July 2014, one of the fume hoods in Albro's lab failed a safety inspection. Washburn, in violation of policy and procedure, instructed Thomas Kravenkovich not to notify Albro that the hood failed the inspection and to allow Albro to continue using it. *Id.* at 84:4-85:14, 87:5-9, 87:20-88:1. A malfunctioning fume hood can create a dangerous environment in which Albro and others could have been harmed. *Id.* at 84:4-85:14. Viewing these disputed facts in the light most favorable to Albro, a reasonable factfinder could infer animus towards Albro by Washburn.

In December 2014, Washburn continued to escalate the hostile work environment by limiting Albro's ability to attend the base holiday party with his family. *Id.* at 91:3-92:2, 92:14-21, 93:1-9. After Albro completed and submitted a proper request for a base pass for Mary Albro, he was told by Washburn's administrative assistant, Margaret Bobby, that he could only have a limited access shared pass for her to use. Washburn was the approving official for the passes to attend the party. *Id.* at 93:2-9. As a result, the Albros did not go to the 2014 holiday party. *Id.* at 92:14-15.

Throughout 2015, Albro was subjected to Washburn's hostility and discrimination. In January 2015, during Albro's STRL performance review, Washburn told him that, with regard to Albro's career, "it will be political from here on out." *See* Pl's Statement of Disputed Facts at ¶

PLAINTIFF'S BRIEF IN OPPOSITION
TO SUMMARY JUDGMENT

40. Later that same month, someone attempted to access Albro's explosives safe and caused him to be locked out of the safe. Ex. 1 at 10 (NAVY_000875). Washburn falsely accused Albro of mismanaging the safe lockout in spite of China Lake security's statements to the contrary. In March 2015, someone wrote, "to be fired" on a whiteboard next to Albro's name. Washburn disputes all of these facts. Viewing these disputed facts in the light most favorable to Albro, a reasonable factfinder could infer animus towards Albro on Washburn's behalf.

Sometime after Agency-mandated mediation between Washburn and Albro failed in February 2015, *see* JSUF [ECF 78-2] at ¶ 6, Davis launched an informal fact-finding. While the fact-finding resulted from Albro's complaints about Washburn, it quickly became apparent that Albro was the focus of the investigation. After interviewing only a small selection of Albro's co-workers—Dr. Alana Spurling,[3] Dr. Thao Tran-Ngo, Dr. Clare Dennis, and Dr. Trevor Hedman—Davis determined Albro was purportedly the problem. Inexplicably, Davis did not interview Washburn about his unprofessionalism despite Albro reporting the lengthy pattern of hostility towards him by Washburn. Ex. 2 (NAVY_003445-57). Viewing the evidence in the light most favorable to Albro, a reasonable jury could find that Davis had already reached his conclusions about Albro before he began the fact-finding.

After Davis told Albro the results of his fact-finding, Albro faced an investigation of his security clearance in July 2015, which occurred because Trevor Hedman, after conferring with Washburn, reported false allegations to China Lake Personnel Security. When Albro's security clearance was not revoked, Greg Wheelock ordered an official management inquiry, likely at the request of Washburn and Davis.

Based on these facts, and viewing these facts in the light most favorable to Albro, a reasonable jury could find that Albro has presented evidence of circumstances that "give rise to an inference of discrimination." The Court should deny the Secretary's motion for summary judgment because Albro has shown a *prima facie* case of discrimination under Title VII.

---

[3]       Farris's notes reference Dr. Spurling by her pre-transition first name of "James."

## II.     Washburn used other management officials as his "cat's paws."

Under the "cat's paw" theory, first articulated by the Supreme Court in *Staub* v. *Proctor Hosp.*, 562 U.S. 411, 413 (2011), the Navy cannot shield itself from liability for discrimination against Albro by using employees who were not members of the LDS Church to carry out the adverse actions. Cat's paw liability occurs where "a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and that if that act is a proximate cause of the ultimate employment action, then the employer is liable." *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 (6th Cir. 2012) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (emphasis in original)). Discrimination can be demonstrated where an employee alleges a "causal nexus" between the ultimate decisionmaker's decision to discipline the employee and the supervisor's discriminatory animus. *See id.* at 350. Additionally, an employee needs to demonstrate that "'[b]y relying on this discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the supervisor's] prejudice—his cat's paw." *See id.*

Proof that an employee's protected class contributed to the adverse action does not necessarily rest on the decision-maker's knowledge alone but may also be established by evidence demonstrating "that at least one individual among multiple decision-makers influenced the final decision and acted at least partly because of the employee's protected [status]." *Smith v. CRST Int'l, Inc.*, 2013 WL 3490647 at *7. *See id.*

### a.  The Secretary relies on disputed or distorted interpretations of facts to argue that the Navy had a legitimate non-discriminatory reason to discipline Albro.

The Secretary relies on Davis and Long's findings from the informal fact-finding and then the management inquiry. Albro disputes the veracity and propriety of the findings in both the informal fact-finding and the management inquiry. In particular, Albro contends that Davis was unduly influenced by Washburn—which is one of the reasons Davis never interviewed Washburn for the informal fact-finding—and that this undue influence carried forward into the management inquiry by Long. For his part, Long decided Washburn and his surrogates—all of

whom misstated facts or events to Long—were more credible than Albro and those who corroborated his story.

### i. Davis, in his informal fact-finding, credited only the reports that cast Albro in a negative light.

Davis based his findings from the informal fact-finding only on interviews with four witnesses, three of whom were biased against Albro:

(1)     Dr. Spurling felt persecuted by others and targeted Albro during the interview, blaming him for this persecution while simultaneously admitting not having a work relationship with Albro: "Ppl. pt. fingers @ me . . . inventing things to discredit me + others (Doesn't say who) . . . I don't have work relationship w/person. Hate involving in what I do. This person managed Exp side of DPA—Rick Albro." Ex. 3 (NAVY_003477-80).

(2)     Dr. Dennis was biased against Albro because he did not attend her wedding and she objected to Albro's strict adherence to the rules regarding loaning and sharing equipment. Ex. 4 (NAVY_003459-62).

(3)     Dr. Hedman, who is a member of the LDS Church, the son of the stake President (Brent Hedman), a pupil of Steve Son (who was a friend of Washburn), demonstrated his bias against Albro throughout his testimony to Davis and Long (and during his deposition). Ex. 5 (NAVY_003468-70); Ex. 20 at 34-35 (NAVY_000863-64).

(4)     Dr. Tran-Ngo, who had no reason to be biased against Albro, spoke about Albro honestly and without bias. Ex. 6 (NAVY_003481-84).

Based on these four interviews, in addition to the interview of Albro, Davis found that Albro was the problem. But the evidence reveals the witnesses who had reason to be biased against Albro all spoke negatively about him, accused him of doing things he did not do, and had virtually nothing positive to say about him. By contrast, Tran-Ngo said she had no hesitation going to Albro to address issues, while also acknowledging the existence of tension in the lab that resulted from the lack of trust between Washburn and Albro. Davis determined the negative answers he received from one person who admitted to not having a work relationship with Albro

(Dr. Spurling), and two people who had reason to be biased against Albro (Dennis and Hedman), were more credible than the positive statements by the person who worked closest with Albro (Dr. Tran-Ngo).

### ii. Long failed to investigate leads because doing so would have changed the outcome of his investigation.

Long failed to follow up on numerous reports from many witnesses throughout the management inquiry. He claimed some things were outside the scope of his investigative authority while others were seemingly so important he needed to write an entire second memo and expected someone else to follow up on them. Unsurprisingly, nearly all of Long's purported concerns in the second memo (Ex. 7 at 1-4 (NAVY_001056-59)) centered around Albro, none of them were ever investigated, and the witnesses who reported them never provided the requested information to substantiate their claims. Despite this, the only persons Long found not credible were Albro, Tran-Ngo, and Dave Pate (against whom Long readily admitted his bias during his deposition; *see* Section II(a)(iv), *infra*).

For his second memo, Long identified purported "Safety Concerns About the Handling, Testing and Reporting of Energetics." Ex. 7 at 1 (NAVY_001056). Based only on unsubstantiated reports from witnesses during the management inquiry, Long made the following allegations about Albro for which there is no evidentiary support: (1) Albro falsified test results; (2) Albro took possession of restricted materials without the proper paperwork in violation of policy and procedures; (3) Albro presented false information, and referred to non-existent reference sources when presenting at a conference; and (4) Albro did not properly follow safety procedures for preparing explosives for testing. *Id.* at 1-2 (NAVY_001056-57). None of these allegations were ever credibly corroborated. Albro denies falsifying test data and the two witnesses who accused him of doing so did not agree on when this supposedly occurred; Will Mangrum claimed Albro falsified data for a "TSE" test while Trevor Hedman claimed Albro misrepresented data while presenting at a conference and then cited to sources that did not exist. Mangrum, a technician with no training as a machinist, is neither a scientist nor an engineer.

Albro Dep. at 149:22-150:10. Long did not know if Mangrum was even qualified to perform a TSE test. Long. Dep. at 63:3-9.

In another unsupported allegation from the second memo, Mangrum, relying on second-hand information, reported to Long that on October 1, 2014, Michael Mann sent Mangrum an email telling him that Albro picked up "5 grams from 4 lots of Martin Minthorn PBXN-3 material without proper paperwork." Ex. 7 at 2 (NAVY_001057). Mangrum never provided the alleged email, Long never asked who Mann was, and Long never asked why Mann sent the email to Mangrum instead of to Albro's supervisor. Long Dep. at 65:16-66:16. In short, Long did nothing to follow-up on the allegation but also failed to determine if this report undermined Mangrum's credibility.

Long asked Trevor Hedman to provide documentation for allegations that Albro falsified test results and cited non-existent references when presenting at a conference; Hedman never provided any documentation. Instead, Dr. Hedman sent Long an email that referenced two attachments that were either not sent or did not exist (and in either case, Long didn't follow up on this). *Id.* at 67:18-25. Long somehow determined Dr. Hedman to be credible. *Id.* at 71:5-19.

Long reported allegations from Dr. Dennis that Albro pressed test pellets in their lab even though the lab purportedly was not approved or certified to do press work. Long did not investigate the allegations but found Dennis's reports credible because "her husband was also there." *Id.* at 69:15-18. Curiously, Long never followed up with or interviewed Dennis's husband (Jacob Dennis). *Id.* at 95:9-17, 95:22-96:20. Further, Long did not consider this report when assessing Dennis's credibility because he deemed the report outside of the scope of his investigative authority—but Long conceded that assessing Dennis's credibility was relevant to his investigation. *Id.* at 96:17-20.

Long substantiated allegations from witnesses based on second-hand and third-hand information without ever interviewing, or following up with, the person or persons who purportedly had first-hand knowledge. In one example, Long claimed to have substantiated a report by Dr. Matt Gross to Washburn that Albro made a statement to Megan Rex about seeing

Gross's ex-wife in a parking lot with a black-eye at the time the couple was going through a divorce. Ex. 7 at 11 (NAVY_001066). But Long never interviewed Gross or Rex. Long Dep. at 219:19-220:5. The allegation, as reported to Long, originated from Rex, who told it to Gross, who reported it to Washburn, who forwarded it to Long. *Id.*

### iii.   Long made erroneous findings in his report.

Long wrote that Albro accused Dr. Joseph Kalman of breaking equipment: "On June 30[, 2015], during their meeting with Dr. Davis about the locks on the cages, Dr. Washburn told Dr. Albro to allow Dr. Kalman to use an IR camera. Dr. Albro refused and stated that he would need something in writing because Dr. Kalman **had broken it in the past.**" Ex. 7 at 14 (NAVY_001069). But Long's interview notes recorded no report from Albro that Kalman had previously broken any equipment. Ex. 1 at 7 (NAVY_000872).

Long also determined—without evidence—that Albro was not being forthcoming about how frequently Albro interacted with Kalman: "I do not believe he was being forthcoming to me regarding his association with Dr. Kalman." Ex. 7 at 13 (NAVY_001068). In attempting to explain this, Long admitted he made observations that were neither recorded in his notes nor in his report and did nothing to investigate where both Albro's and Kalman's workspaces were located: "There's a lot of comments Joe did this or Joe did that or Joe didn't know how to do this or Joe didn't know how to do that. Just general comments in general. It wouldn't necessarily be in notes. That you don't get from meeting a person once or twice." Long Dep. at 220:1-221:7.

### iv.   Long admitted bias against certain witnesses, and in favor of other witnesses, during the management inquiry.

Long admitted in his deposition to bias against Dave Pate, Dr. Tran-Ngo, and Albro. Long Dep. at 71:5-19, 170:1-13. With respect to Pate, Long directly admitted that his bias was based on "work[ing] with [Pate] for 15 years and that's [being untruthful] what he's known for." *Id.* at 170:1-13. He claimed that nothing Pate told him was "plus or minus anything," *id.*, but he also disregarded Pate's story wholesale because he believed Pate to be untruthful before he began the management inquiry. Long Dep. at 168:24-169:16.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### v. Long assessed the credibility of witnesses against Albro in every instance.

Throughout his deposition, Long was clear that he assessed the credibility of witnesses and, when he did so, he determined that witnesses who favored Albro—Tran-Ngo, Pate, and Albro himself—were not credible, while all the witnesses against Albro were more credible. Long assessed the credibility of witnesses who told conflicting stories—some of them based on second-hand information—and in every instance, Long found the management surrogates more credible than witnesses who favored Albro. Long found Dennis credible when her only corroborating witness was her husband (again, whom Long did not interview), Long Dep. at 69:15-18.; he found Albro and Pate not credible regarding the tranquilizer pistol and instead found Dennis's story credible, Long Dep. at 158:9-24; and he believed Dr. Tran-Ngo was protective of Albro and thus less credible, Long Dep. at 134:16-135:13. Long believed Mangrum despite Albro reporting that Mangrum was engaged in a *quid pro quo* with Washburn; he credited Dr. Hedman despite spurious unsupported allegations that Albro gave false data at a conference; and he credited Kalman and Spurling over Albro, Tran-Ngo, and Pate. In fact, the only witnesses Long believed were dishonest with him were Albro, Tran-Ngo, and Pate; "Q Did anyone other than [Albro and Tran-Ngo] say something to you that you believed was not true? A Dave Pate. Q Anybody else? A No. That would have been it." Long Dep. at 54:24-55:3.

### vi. Long failed to interview material witnesses.

Long identified, but failed to interview, several witnesses with material information to his management inquiry investigation, including Matt Gross, Long Dep. at 107:4-5, 219:19-25; Dr. Dennis's husband, Long Dep. at 95:22-96:16; Darlene Soto, head of physical security for China Lake, Long Dep. at 138:12-20, 226:13-15; Megan Rex, Long Dep. at 220:21-23; and Nick Quigley, who reportedly alleged safety violations against Albro, Long Dep. at 226:16-20. In failing to interview these witnesses, Long relied on materially incomplete information to form his conclusions and make his recommendations to Wheelock. If Long had formally interviewed those witnesses, he could have more fully assessed the credibility of the witnesses he did

PLAINTIFF'S BRIEF IN OPPOSITION
TO SUMMARY JUDGMENT

interview. Long chose not to interview these witnesses because he did not want any of them to challenge the conclusions he reached about Albro, Tran-Ngo and the other witnesses.

### vii.   Long's claim that he drafted his report without help is disputed.

Long claimed he authored his report and memo without assistance; "[n]o one helped me with anything that I wrote." Long Dep. at 59:24-60:2. This is disputed by Farris who claims she edited several drafts of Long's report. Farris Dep. at 114:24-115:6. Farris, because she worked in HR, was the only person involved at every level of investigation and decision-making. She helped Davis with the informal fact-finding, Farris Dep. at 55:25-56:2, she helped Long with his formal management inquiry, *id.* at 102:21-104:7, 118:6-119:16, she helped Long write his report, *id.* at 114:24-115:6, she drafted the Notice of Proposed Suspension for Wheelock, *id.* at 127:1-128:3, and she assisted Charles Bechtel with the decision to uphold the suspension. *Id.* at 130:24-132:9; *see also* Pl.'s Add'l Undisputed Facts at ¶ 43.

### b.   Washburn's discriminatory animus was the reason for the adverse actions against Albro.

Washburn began creating a hostile work environment for Albro immediately after Washburn's promotion to Brach Head for Combustion Sciences. Albro's mistreatment began immediately after Washburn's promotion and was linked to Albro's rejection of Washburn's— and others—attempts to recruit Albro to join the LDS Church. Washburn's ambition within the LDS Church and at China Lake was no secret; Washburn wanted to be a bishop in the church, and targeted Albro and his family. When the disputed facts are viewed in the light most favorable to Albro, a reasonable jury could find that Washburn was upset Mary Albro disassociated herself from the LDS Church and refused to entertain the possibility of reconciliation. When Albro complained about Washburn's mistreatment, Washburn began using others—Davis, Wheelock, and Bechtel—to execute his discrimination against Albro. Davis had reason to aid Washburn because of the benefits Washburn provided to him through Washburn's allies in the LDS Church.

### c. The Secretary's proffered nondiscriminatory reason for disciplining Albro was pretextual.

The Secretary's proffered nondiscriminatory reason for disciplining Albro was pretextual because it was based on the flawed findings of the incomplete and biased management inquiry by Long—which followed a similarly flawed and biased informal fact finding by Davis. Davis began the informal fact-finding after the mediation between Albro and Washburn failed in February 2015 and before Albro complained to Farris and Davis of further unprofessional conduct by Washburn. Farris Dep. at 42:14-21; *see also* JSUF [ECF 78-2] at ¶ 6. Washburn's influence over Davis because of Washburn's connections to LDS members working at China Lake is of material importance and is disputed in this case by the Secretary.

Genuine issues of material fact exist regarding: (1) whether Davis's findings from the informal fact-finding were influenced by Washburn; (2) whether Long reasonably assessed the credibility of witnesses given his admission of bias against at least one witness during the investigation; (3) the propriety of Long's grossly incomplete management inquiry, (4) whether Washburn used other management officials—Davis, Long, and Wheelock—to effect his discrimination against Albro; and (5) whether Washburn also used Farris to further his discrimination against Albro through her involvement at every level of the investigation and discipline of Albro.

There is a causal connection between Washburn's discriminatory animus towards Albro and the findings which the Secretary relied on in making its purportedly non-discriminatory decision to discipline Albro. Washburn possessed the discriminatory animus, he influenced Davis, Davis influenced Farris, Farris influenced Long and Wheelock, and Farris and Wheelock influenced Bechtel.

### III. A reasonable jury could find that the Navy discriminated against Albro because of his non-membership in the LDS Church.

#### a. Direct evidence of religious discrimination is not required where a *prima facie* case is established.

Based on the plain language of 42 U.S.C. § 2000e-2(m), "direct evidence of discrimination is not required . . . circumstantial evidence is sufficient." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-102 (2003). Federal courts permit plaintiffs to prove discrimination with circumstantial evidence by demonstrating other evidence suggests that the plaintiff was subjected to discrimination. *Bodett*, 366 F.3d at 743. Under some circumstances, circumstantial evidence has been deemed "more certain, satisfying and persuasive than direct evidence." *Benuzzi v. Bd. of Educ.*, 647 F.3d 652, 662 (7th Cir. 2011).

As direct evidence is not required when a *prima facie* case is established, Albro has met the standard for showing discrimination under Title VII.

### b. Albro has shown a *prima facie* case of religious discrimination in violation of Title VII.

As demonstrated above, Albro has shown a *prima facie* case for religious discrimination under Title VII based on his non-membership in the LDS Church. The Secretary argues that it was right to discipline Albro for "numerous acts of inappropriate conduct[.]" [ECF 78-1 at 12]. But the record demonstrates this finding was flawed and pretextual. Because Albro has demonstrated the existence of numerous disputed material facts that show animus towards him based on his non-membership in the LDS Church, the Court should deny the Secretary's Motion for Summary Judgment.

### CONCLUSION

Albro has shown the existence of significant material facts in dispute in this matter. He has demonstrated that a reasonable jury, taking those disputed facts in the light most favorable to him, could return a verdict in his favor for discrimination under Title VII. Defendant's Motion for Summary Judgment should be denied.

1    Dated: July 13, 2023                    Respectfully submitted,

2                                            /s/ John T. Harrington
3                                            R. Scott Oswald
                                             John T. Harrington
4                                            The Employment Law Group, P.C.
                                             1717 K Street, N.W., Suite 1110
5                                            Washington, D.C. 20006
                                             (202) 261-2838 (telephone)
6                                            (202) 261-2835 (facsimile)
7                                            soswald@employmentlawgroup.com
                                             tharrington@employmentlawgroup.com
8                                            *Co-Counsel for the Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: 1:18-cv-01156-ADA-CDB                    PLAINTIFF'S BRIEF IN OPPOSITION
                                                   TO SUMMARY JUDGMENT

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 13, 2023, a true and correct copy of the foregoing was served via electronic mail upon:

W. Dean Carter, Assistant U.S. Attorney
501 I Street, Suite 10-100
Sacramento, California 95814
(916) 554-2781
dean.carter@usdoj.gov

<u>/s/ John T. Harrington</u>
R. Scott Oswald
John T. Harrington
The Employment Law Group, P.C.
1717 K Street, N.W., Suite 1110
Washington, D.C. 20006
(202) 261-2838 (telephone)
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
tharrington@employmentlawgroup.com
*Co-Counsel for the Plaintiff*